IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

|  |  |  |
|---|---|---|
| CROWN BAY MARINA, L.P., | ) ) ) ) |  |
|  | ) | Civil No. 2018-68 |
| Plaintiff, | ) ) |  |
| v. | ) ) |  |
| SUBBASE DRYDOCK, INC., *et al.*, | ) ) ) |  |
| Defendants. | ) ) |  |

**MEMORANDUM OPINION**

Before the Court is defendant "Subbase Drydock, Inc.'s Motion for Summary Judgment" ("Subbase") [ECF 101]. Plaintiff Crown Bay Marina, L.P. ("CBM") filed an opposition [ECF 109] and Subbase replied [ECF 135]. Also before the Court is CBM's cross motion for summary judgment, which CBM included as part of its opposition to Subbase's motion. Subbase filed an opposition [ECF 163][1] and CBM replied [ECF 166].

## I.     STATEMENT OF FACTS

Plaintiff CBM, a Delaware Limited Partnership, owns the Crown Bay Marina ("the Marina"), a boat docking facility located on St. Thomas in the U.S. Virgin Islands. Ver. Compl.

---

[1] Subbase has moved to strike CBM's cross motion for summary judgment because it was filed out of time and because it does not conform to the local rules. [ECF 124]; *see* [ECF 125]. CBM opposed the motion to strike [ECF 127] and Subbase replied [ECF 128]. The Court finds that the cross motion was not timely filed, given the July 22, 2020 deadline the Court set for the filing of dispositive motions, and that CBM did not request leave to file the cross motion out of time. The Court need not strike the pleading, however, because on the merits, as discussed below, the cross motion fails.

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 2

[ECF 1] ¶¶ 4, 5.  CBM contracted with Marine Management Services, Inc. to manage the Marina, which included the rental of the Marina's dock slips.  *Id.* ¶ 13.

Defendant Subbase is a U.S. Virgin Islands Corporation with its principal place of business on St. Thomas.  Ver. Compl. [ECF 1] ¶ 7.  Subbase "is a marine repair and maintenance company that services vessels, including ferries, and offers general drydock services."  *Id.*  Subbase is owned by Eugene Kral, Sr., his wife Mary Kral, and their son Eugene Kral, Jr.  Kral, Sr. Dep. [ECF 103-1] at 5.[2]

In September 2017, just before Hurricane Irma hit St. Thomas, Subbase was the agent and custodian of the two vessels at issue in this case:  the M/V Culebra II ("the Culebra II") and the M/V Caribena ("the Caribena").  Ver. Compl. [ECF 1] ¶¶ 9, 16; Kral, Sr. Dep. [ECF 103-1] at 11; [ECF 110-4] at 3.  Prior to Hurricane Irma, both vessels were at the Subbase drydock undergoing repairs.  *Id.* at 7-8.  The Culebra II, which was destroyed during Hurricanes Irma and Maria, was a 145-foot passenger ferry.  [ECF 1-2] at 1.  The Caribena is a 100-foot passenger ferry.  [ECF 1-1] at 1.   Both vessels were owned by the Puerto Rico and Municipal Islands Maritime Transport Authority ("PRMTA").  [ECF 110] ¶ 5; [ECFs 110-6, 110-7].

In the days leading up to the storms, the National Hurricane Center warned that Hurricane Irma was likely to hit St. Thomas.  Ver. Compl. [ECF 1] ¶ 14; [ECF 103-11].  On August 30, 2017, Luis M. Abreu-Noble, Executive Director of the PRMTA, signed as "Responsible person" and provided Subbase with a "Statement of Responsibility and Waiver" for each vessel.  Kral, Sr. Dep. [ECF 103-1] at 9-10; [ECFs 103-6, 103-7].  In pertinent part, the document provides:

> 6) Responsible Person understands that SUBBASE is not and shall not be responsible for the Vessel, or for damage caused by the

---

[2]  References to deposition transcripts will indicate the page number of the docket entry, rather than the page number of the transcript.

> Vessel, as a result of any movement or action done or permitted by
> this Statement, or as a result of any storm, weather, or sea condition.
> Responsible Person waives all claims against SUBBASE for any
> action taken or not taken by SUBBASE that is permitted by this
> Statement.
>
> 7) Responsible Person promises to defend, indemnify, and hold
> harmless SUBBASE for and against any and all claims, demands,
> suits, or other actions by any person or entity related to the exercise
> by SUBBASE of the permission given to it by this Statement.

[ECF 103-6] at 2.  Following Subbase's receipt of the executed documents, Subbase contacted

PRMTA to find out where it wanted the vessels taken if it became necessary due to the approaching

storm.  [ECF 110] ¶ 11.

On September 3, 2017, Subbase hired a tow company to move the Culebra II and the

Caribena from Subbase to the Marina.  [ECF 110] ¶ 16; Kral, Sr. Dep. [ECF 103-1] at 16; Kral, Jr.

Dep. [ECF 103-9] at 3-5.  The Marina's manager told Kral, Jr. that he could tie up the Caribena in

any spot he liked.  [ECF 110] ¶ 17.  The Culebra II was tied up at the Marina in the only spot in

which it would fit.  Kral, Jr. Dep. [ECF 103-9] at 5.  Initially, Subbase secured tires to each vessel;

it later removed them at the request of Marina employee Jerry Ocello and replaced them with

fenders supplied by PRMTA.  [ECF 110] ¶ 20; [ECF 103-9] at 7-8.

On September 5, 2017, Kral, Jr. executed three documents for CBM per vessel.  [ECF 110-

4] at 3.  The first document, the License Agreement for Dockage ("the License Agreement"), is a

two-page document that details the conditions under which dock space at the Marina may be

occupied.  *See, e.g.*, [ECF 103-13] at 1.  In the paragraph that immediately precedes the

"Agent/Owner's/Captain's Signature" block on the first page, where Kral, Jr. signed, the License

Agreement provides:

> <u>Ownership and No Assignment</u>:  The person who has signed this
> Agreement as Owner hereby represents and warrants that he is in

fact and in law the true owner of the Vessel or the duly authorized or empowered agent of the Owner, and that he has full power and right to enter into this Agreement for himself and for the Vessel, and that there are no restrictions of any kind upon him or the Vessel which limit or restrict his right and power to bind himself and the Vessel to each and every term and condition of this Agreement.  In the event of any change of ownership of the Vessel, Owner shall give notice thereof in writing to Marina.  Owner shall remain responsible to Marina for all sums due and owing hereunder until such new owner enters into an Agreement with Marina, or until Vessel is removed.  This Agreement is not transferable or assignable in any way without the express written consent of Marina.

*Id.*  The License Agreement further provides:

4.      Owner warrants and represents that at all times during the term of this Agreement, the Vessel shall be maintained in a safe and seaworthy condition by Owner and shall be operated in a careful and safe manner so as not to cause damage to Marina's facilities or to any other property, vessel or persons.  . . .

* * *

8.      Storms and Other Emergencies:  The Owner shall make suitable arrangements for safe, sheltered anchorage during tropical storms, hurricanes or other inclement weather and Owner hereby warrants such arrangements have or will be made.  . . .

* * *

10.      Owner shall be liable for all damages to the Boat Slip and other facilities owned by the Marina and other boats or vessels or persons on or about Marina's premises caused by the Vessel, Owner's employees, family, agents, invitees or guests (collectively referred to as the "Vessel's Parties").  . . .

*Id.* at 1-2.

The second document, the Dayworker Agreement of Waiver of Liability and Assumption of Risk ("the Dayworker Agreement") is a one-page document that addresses liability for damages resulting from work performed by individuals not employed by the Marina on vessels berthed at the Marina.  *See, e.g.*, [ECF 103-14].  The agreement states that it is "[t]o be signed by

Owner/Captain." *Id.* Kral, Jr. signed the agreement and wrote "Representative" on the line immediately above the word "Title." *Id.*

The third document, the Crown Bay Marina 2017 Hurricane Evacuation Protocol ("the Evacuation Protocol"), consists of one page and lists the protocols for evacuating vessels secured at the Marina during the 2017 hurricane season. *See, e.g.*, [ECF 103-15]. Also, the Evacuation Protocol reproduces paragraphs 8 and 10 of the License Agreement. At the top of the Evacuation Protocol is a blank space for the "owner/agent of the vessel" to print his name. *Id.* At the bottom of the Evacuation Protocol is a signature block for the "Owner/Owners Agent Signature." *Id.* Kral, Jr. printed his name at the top of the document and signed his name at the bottom. *Id.*

On September 6, 2017, Subbase moved the Caribena to a new location within the Marina. Kral, Sr. Dep. [ECF 103-1] at 22-23. That day, Hurricane Irma passed over St. Thomas. Ver. Compl. [ECF 1] ¶ 20. During Hurricane Irma, the Caribena broke free from its mooring. Kral, Sr. Dep. [ECF 103-1] at 22. The vessel ended up next to a dock east of where it had been tied up. *Id.* at 24. The Culebra II also broke free from its mooring at the Marina and sank outside the Marina. *Id.* at 23; Ver. Compl. [ECF 1] ¶ 21.

On December 5, 2017, Subbase received a Notice of Final Inspection from CBM. [ECF 110-8]. Subbase forwarded the notice to its insurance carrier. *Id.*

On August 17, 2018, CBM sent Subbase a letter seeking payment for the damage caused by the Culebra II and the Caribena. [ECF 110-9].

In the instant suit, CBM claims Subbase breached the terms of the License Agreement and the Evacuation Protocol by failing to pay for damage caused by the vessels. Ver. Compl. [ECF 1] ¶ 31. CBM further claims that Subbase breached the "reasonable duty of care to manage, operate, and moor the vessels in its custody and care in a reasonably safe manner." *Id.* ¶ 24. CBM contends

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 6

that Subbase and the vessels are jointly and severally liable for the damage caused and seeks to maintain a lien on the vessels to satisfy any judgment. *Id.* ¶¶ 23, 25. CBM demands over $1.4 million in damages. *Id.* ¶ 30.

Subbase seeks summary judgment as to both CBM's contract and tort claims. [ECF 102] at 1. Regarding CBM's contractual indemnity claim, Subbase argues that it is not the party obligated to indemnify CBM. *Id.* Regarding CBM's tort claim, Subbase contends that CBM's negligence claim is precluded by the gist of the action doctrine. *Id.*

In its cross motion for summary judgment, CBM argues that Subbase is liable to CBM for breach of contract by failing to have CBM named as an additional insured on its or PRMTA's policy and by failing to identify PRMTA as a principal. [ECF 109] at 6-7, 13-15. CBM further contends that as "owner's agent," Subbase is liable under the various contracts to the same extent as the vessels' owner. *Id.* at 3-6.

## II.      LEGAL STANDARDS

A.      <u>Summary Judgment</u>

Summary judgment is appropriate where an examination of the pleadings, affidavits, and other proper discovery materials before the court demonstrates "there is no genuine dispute as to any material fact," thus entitling the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (explaining that "irrelevant or unnecessary" factual disputes do not preclude summary judgment). A factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "In considering a motion for summary judgment, a [] court may not make credibility determinations or engage in any

weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"   *N.H. Ins. Co. v. Diller*, 678 F. Supp. 2d 288, 295 (D.N.J. 2009) (quoting *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004)).

The movant has the initial burden of showing no genuine issue of material fact exists. *Gans v. Mundy*, 762 F.2d 338, 342 (3d Cir. 1985).   Once the moving party meets this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing there is a genuine issue for trial.  *Celotex Corp.*, 477 U.S. at 323; *see Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991) (stating that the non-moving party "may not rest upon mere allegations, general denials, or . . . vague statements"); *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) ("[S]ummary judgment is essentially 'put up or shut up' time for the nonmoving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.").

B.    <u>Maritime Law</u>

District courts of the United States "have original jurisdiction . . . of [a]ny civil case of . . . maritime jurisdiction."  28 U.S.C. § 1333(1).[3]  "The fundamental interest giving rise to maritime jurisdiction is the protection of maritime commerce."  *Hargus v. Ferocious & Impetuous, LLC*, 840 F.3d 133, 136 (3d Cir. 2016) (quotation marks omitted).  In determining whether admiralty jurisdiction exists, the court applies substantive federal admiralty law.  *Interested Underwriters at Lloyd's v. Haulover Marine, Inc.*, 866 F. Supp. 235, 236-37 (D.V.I. 1994).

1.    <u>Maritime Tort Claims</u>

"For a federal court to have admiralty jurisdiction over a tort claim, the tort must (1) occur

---

[3]  Under 48 U.S.C. § 1612(a), the District Court of the Virgin Islands has the same "jurisdiction of a District Court of the United States."

on navigable waters and (2) bear some relationship to traditional maritime activity." *Andreu v. Palmas del Mar Homeowners Ass'n, Inc.*, 311 F. Supp. 3d 456, 459 (D.P.R. 2018) (citing *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995)). Navigable waters are those which, on their own or in conjunction with others, form "a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water." *Andreu*, 311 F. Supp. 3d at 459-60 (quoting *The Daniel Ball*, 77 U.S. 557, 563 (1870)). Torts bear a relationship to traditional maritime activity if the incident could potentially disrupt maritime commerce and if "the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Andreu*, 311 F. Supp. 3d at 460-61 (quoting *Grubart*, 513 U.S. at 534).

Finally,

> a plaintiff asserting a maritime negligence cause of action must show "(1) 'the existence of a duty required by law which obliges the person to conform to a certain standard of conduct'; (2) 'a breach of that duty by engaging in conduct that falls below the applicable standard or norm'; (3) a resulting loss or injury to the plaintiff; and (4) 'a reasonably close causal connection between the offending conduct and the resulting injury.'" *Id.* (alterations omitted) (quoting 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law*, §§ 5–2, at 252 (5th ed. 2011)).

*Pogan v. M/V Venture Pride*, 2018 WL 1548687, at *2 (D.V.I. Mar. 28, 2018). Thus, the elements of a negligence claim under admiralty law are "essentially coextensive with its common law counterpart." *Id.* (quoting *In re Frescati Shipping Co.*, 718 F.3d 194, 207 (3d Cir. 2013)). In other words, "[u]nder the general principles of negligence, mariners are expected to exercise human skill and precaution, and a proper display of nautical skill, *i.e.*, reasonable care under the circumstances." *Pogan*, 2018 WL 1548687, at *2 (quotation marks omitted).

In this case, CBM's tort claims related to the mooring of the Culebra II and the Caribena are governed by federal admiralty law.  First, the general features of the incident—damage to a marina located on navigable waters allegedly caused by commercial vessels docked at that marina during a hurricane—could potentially disrupt commercial activity.  *See Sisson v. Ruby*, 497 U.S. 358, 363 (1990) ("Here, the general features [of the incident]—a fire on a vessel docked at a marina on navigable waters—plainly satisfy the requirement of potential disruption to commercial maritime activity.").  Second, the mooring of vessels at a marina situated on navigable waters is substantially related to traditional maritime activity.  *See id.* at 367 ("Clearly, the storage and maintenance of a vessel at a marina on navigable waters is substantially related to 'traditional maritime activity' given the broad perspective demanded by the second aspect of the test.  Docking a vessel at a marina on a navigable waterway is a common, if not indispensable, maritime activity.").

2.   Maritime Contract Claims

Where the court has admiralty jurisdiction over a contract claim, the court must apply federal choice of law rules to determine the applicable law.  *Calhoun v. Yamaha Motor Corp., U.S.A.*, 216 F.3d 338, 343 (3d Cir. 2000); *accord State Trading Corp. of India v. Assuranceforeningen Skuld*, 921 F.2d 409, 414 (2d Cir. 1990) ("A federal court sitting in admiralty must apply federal choice of law rules.").  "[C]ourts apply federal choice-of-law rules by 'ascertaining and valuing points of contact between the transaction and the states or governments where competing laws are involved.'"  *Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC*, 324 F. Supp. 3d 366, 383-84 (W.D.N.Y. 2018) (quoting *Lauritzen v. Larsen*, 345 U.S. 571, 582 (1953)).  Those points of contact are "(1) any choice of law provision contained in the contract; (2) the place where the contract was negotiated, issued, and signed; (3) the place of performance;

(4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties." *Advani Enters., Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 162 (2d Cir. 1998).[4]

"[W]hen a maritime contract contains a choice-of-law clause, the law chosen by the parties governs . . . unless (1) that jurisdiction has no substantial relationship to the parties or the transaction or (2) that jurisdiction's law conflicts with the fundamental purposes of maritime law . . . ." *Farrell Lines Inc. v. Columbus Cello-Poly Corp.*, 32 F. Supp. 2d 118, 127 (S.D.N.Y. 1997) (citations and quotation marks omitted).  In other words, "[t]he fact that a choice-of-laws provision exists in a contract does not, by itself, remove the contract from the scope of maritime law." *Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 49 (2d Cir. 2008).  Rather, "once a contract has been deemed a maritime contract, the next step is determining whether a specific state's laws should be used to *supplement* any area of contract law for which federal common law does not provide." *Id.* (emphasis in original).

Here, CBM is suing Subbase for breach of the License Agreement and the Evacuation Protocol.  Ver. Compl. [ECF 1] ¶ 31.  Paragraph 17 of the License Agreement provides that the agreement "shall be governed by, construed and enforced in accordance with the Laws of the Territory of the U.S. Virgin Islands and the United States of America." *See, e.g.*, [ECF 110-3] at 2.  Unlike the License Agreement, the Evacuation Protocol does not contain a choice of law provision.  Nevertheless, (1) the Evacuation Protocol was issued and signed in the Virgin Islands; (2) the agreement was performed in the Virgin Islands; (3) the subject matter of the contract—evacuation protocols for vessels stored at the Marina—is located in the Virgin Islands; and (4)

---

[4] When a maritime contract does not contain a choice-of-law provision, the court simply skips the first factor. *Travelers Prop. Cas. Co. of Am.*, 324 F. Supp. 3d at 384.

both CBM and Subbase are located in the Virgin Islands, with Subbase being incorporated in the Virgin Islands.  Because "all writings that are part of the same transaction are interpreted together," *Sunshine Shopping Ctr., Inc. v. Kmart Corp.*, 85 F. Supp. 2d 537, 540 (D.V.I. 2000) (quotation marks and citation omitted), both agreements are governed by federal maritime law possibly supplemented with Virgin Islands law.

## III.   DISCUSSION

A.   <u>CBM's Contract Claim</u>

Subbase moves for summary judgment on CBM's contract claim on the grounds that it cannot be held liable under the various CBM agreements as a matter of law—notwithstanding that it executed them as PRMTA's representative—because those agreements only impose liability on the vessels' owner.  [ECF 102] at 10.  Subbase explains that the language of the License Agreement is ambiguous because it defines the term "Owner" to include "Owner" and "Owner's Agent" while simultaneously referring to them as distinct entities.  *Id.* at 10-11.  Subbase argues that this ambiguity is further demonstrated by the fact that the Evacuation Protocol contains the identical language regarding the Owner's liability but does not define the term "Owner."  *Id.* at 12-13. Resolving these ambiguities against CBM, the drafter of the contracts, Subbase concludes that the CBM documents should be construed as imposing liability only on PRMTA for any damage caused by its vessels.  *Id.* at 11-13.

CBM counters that the License Agreement is not ambiguous and that therefore the Court should grant its cross motion for summary judgment on the contract claim.  *Id.* at 7.  According to CBM, the parties expressly agreed that the term "Owner" included "Owner's Agent" because the License Agreement defines the terms that way.  *Id.* at 8-9.  CBM further contends that whether the three contracts are read separately or collectively, Subbase remains liable.  *Id.* at 9-10.  If the

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 12

contracts are read separately, CBM argues, the License Agreement makes Subbase liable because "Owner's Agent" is included in the definition of "Owner." *Id.* at 9. If the contracts are read collectively, CBM continues, the result is the same because the documents are related and therefore the License Agreement's definition of "Owner" also applies to the other documents. *Id.*

"[O]ur interpretation of maritime contracts sounds in federal common law, so we look to the general common law of contracts." *Internaves de Mex. s.a. de C.V. v. Andromeda S.S. Corp.*, 898 F.3d 1087, 1093 (11th Cir. 2018). Under the federal common law, "[t]he elements of a breach of contract claim are the existence of a contract, material breach, and damages." *Kol B'Seder, Inc. v. Certain Underwriters at Lloyd's of London Subscribing to Certificate No. 154766 Under Contract No. B0621MASRSWV15BND*, 766 F. App'x 795, 803 (11th Cir. 2019). These are essentially the same elements specified by Virgin Islands law. *See Benjamin v. Gov't of the Virgin Islands*, 2020 WL 1426691, at *4 (V.I. Super. Mar. 16, 2020) (noting that the elements for a breach of contract are "(1) the existence of a contract; (2) a contractually created duty; (3) a breach of that duty; and (4) damages suffered due to that breach."). In this case, neither party disputes the existence of the contracts. The parties do disagree, however, as to the terms of those contracts. Therefore, the first task is to determine what constitute the terms of the contracts.

"Generally, in applying principles of contract interpretation, a court must first determine whether the [contract's] language states the parties' intentions clearly and unambiguously." *Atlantic Basin Ref. Inc. v. Arclight Capital Partners, LLC et al.*, 2018 WL 3431974, at *7 (D.V.I. July 16, 2018) (applying Virgin Islands law). "To be unambiguous, an agreement must be reasonably capable of only one construction." *Addie v. Kjaer*, 2009 WL 482497, at *5 (D.V.I. Feb. 23, 2009) (quoting *Washington Hosp. v. White*, 889 F.2d 1294, 1301 (3d Cir. 1989)). "Whether the contract is ambiguous is a question of law, but 'if the terms are ambiguous, the issue

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 13

of the meaning of the terms becomes a question of fact.'" *H.D.V.I. Holding Co., Inc. v. CDP, LLC et al.*, 2018 WL 3213138, at *4 (D.V.I. June 29, 2018) (quoting *United Corp. v. Tutu Park Ltd.*, 55 V.I. 702, 707 (2011)). Whether a contract is ambiguous is informed by reference to extrinsic evidence of the contracting parties' intent, such as their conduct. *H.D.V.I. Holding Co., Inc.*, 2018 WL 3213138, at *5. "Where a contract remains ambiguous considering the extrinsic evidence, summary judgment is defeated." *Id.*

The Court finds that, when viewed individually or collectively,[5] the terms of the contracts are ambiguous in that they are capable of at least two interpretations. On the one hand, the term "Owner" could include both the "Owner" and the "Owner's Agent," as expressly defined in the License Agreement. *See, e.g.*, [ECF 110-3] at 1 (". . . the Owner (herein defined as 'Owner' or 'Owner's Agent' . . . .). On the other hand, the term "Owner" could be viewed as an entity separate and distinct from "Owner's Agent," as suggested by references within the License Agreement to one or the other. *See, e.g., id.* at 2 ("7. . . . the Owner or Owner's Agent agrees . . . ."). Thus, the Court must look to extrinsic evidence to discern the parties' intent.

Here, both parties agree that on two previous occasions, Subbase paid CBM for damages to the Marina caused by PRMTA vessels.[6] But, the parties do not agree as to what Subbase's payment of those bills meant. CBM argues that by doing so, Subbase was fulfilling its obligation under the License Agreement. [ECF 109] at 12. Conversely, Subbase contends that it did so only

---

[5]  *See Phillip v. Marsh-Monsanto*, 2017 WL 2334248, at *6 (V.I. May 30, 2017) ("It is a general rule of contract law that where two writing are executed at the same time and are intertwined by the same subject matter, they should be construed together, and interpreted as a whole, each one contributing to the ascertainment of the true intent of the parties.'") (quoting *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 107-08 (3d Cir. 1986)).

[6]  On May 11, 2015, Subbase paid CBM $2,285.00 for damages to the Marina caused by PRMTA's ferry vessel Cayo Largo.  [ECFs 110-6, 110-7]; [ECF 164] ¶¶ 10, 12.  Also in 2015, Subbase paid CBM approximately $1,500.00 for damages to the Marina caused by PRMTA ferry vessel Culebra II.  [ECF 110] ¶ 22; Kral, Sr. Dep. [ECF 110-1] at 13.

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 14

"to keep relations on good terms with Crown Bay" and because the amount sought was "minor." Kral, Sr. Dep. [ECF 110-1] at 13.

Further, the parties do not dispute that when Subbase received CBM's Notice of Final Inspection, Subbase forwarded it to its insurance carrier. According to CBM, this demonstrates that Subbase understood that it was liable under the agreements as PRMTA's agent. [ECF 109] at 13. Subbase counters that it was simply obliged under the terms of its insurance contract to notify its carrier of any claims against Subbase. [ECF 135] at 7.

Lastly, the parties do not dispute the fact that Subbase has not sued PRMTA for indemnification despite having an indemnity agreement with PRMTA. In CBM's view, this, too, demonstrates Subbase's understanding that Subbase is liable to CBM as PRMTA's agent for damage to the Marina caused by PRMTA's two vessels. [ECF 109] at 13. Subbase argues that the mere existence of the indemnity agreement between it and PRMTA does not support CBM's conclusion that Subbase understood that it had an obligation to indemnify CBM under the License Agreement and Evacuation Protocol. [ECF 135] at 7.

Ultimately, although the above extrinsic evidence is not disputed, *per se*, the parties draw different inferences from that evidence. There also may be additional extrinsic evidence of the parties' intent that has not yet been put before the Court. In sum, there remain genuine issues of material fact as to the parties' intent when entering into the contracts; both parties' motions for summary judgment as to CBM's contract claim will be denied.[7]

---

[7]  In its cross motion for summary judgment, CBM argues that Subbase breached the terms of the License Agreement by failing to have CBM named as an additional insured on its or PRMTA's policy. [ECF 109] at 6-7. CBM also argues that Subbase is liable to CBM in contract because it failed to identify PRMTA as a principal. *Id.* at 13-15. According to CBM, Virgin Islands law mandates that an agent disclose its principal at the time documents are executed on the principal's behalf; otherwise the agent is liable under the contract. *Id.* at 14. However, neither of these claims appears in the Verified Complaint. Therefore, the Court need not consider these arguments. *See Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 24 (1st Cir. 1990) ("[I]nitial failure to satisfy the [pleading] burden in no way

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 15

B.     CBM's Tort Claim

Subbase seeks summary judgment on CBM's negligence claim under the gist of the action

doctrine.  [ECF 102] at 14-17.  In Subbase's view, the duties allegedly breached flow from the

three dockage agreements.  *Id.* at 16-17.  Specifically, Subbase contends that these agreements (1)

"directly address the responsibility and liabilities related to securing a vessel at the marina;" (2)

"specify the duty of care" by requiring that the vessels be maintained "in a safe and seaworthy

condition" and that they be operated "in a careful and safe manner" so as not to damage the Marina;

and (3) "define who is liable for any damage to the marina."  *Id.* at 16.

CBM argues that the gist of the action doctrine does not apply.  [ECF 109] at 15-20.  Rather,

CBM contends that Subbase is liable for damages both under the contracts and "in tort to CBM

regardless of whether any contract ever existed."  *Id.* at 18.  CBM avers that it could have sued

Subbase for negligence even if the parties had not entered into the contracts at issue.  *Id.* at 20.

According to CBM, not only do Subbase's duties derive from different sources, but the duties

themselves are different:  "Subbase has breached the contract by refusing to pay for damages to

the marina as required in the dockage agreement . . . Subbase breached its duty in tort by, *inter*

*alia*, failing to properly secure the vessels."  *Id.*

The gist of the action doctrine is a "theory under common law designed to maintain the

conceptual distinction between breach of contract claims and tort claims."  *Addie v. Kjaer*, 737

F.3d 854, 865 (3d Cir. 2013).  It is applied

> when the claims are (1) arising solely from a contract between the
> parties; (2) where the duties allegedly breached were created and
> grounded in the contract itself; (3) where liability stems from a

---

obligates the district court to allow the parties an opportunity to offer matters outside the pleadings.  Simply put,
summary judgment is not a procedural second chance to flesh out inadequate pleadings."); *accord Wasco Prods., Inc.*
*v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006).

> contract; or (4) where the tort claim essentially duplicates a breach
> of contract claim or the success of which is wholly dependent on the
> terms of a contract.

*Id.* at 866.

Here, although the Third Circuit has held that the doctrine "is applicable in the Virgin

Islands," *Addie*, 737 F.3d at 866, neither the Third Circuit nor any other circuit appears to have

held that the doctrine may be applied by federal courts sitting in admiralty.  *See Blank River Servs.,*

*Inc. v. Towline River Serv., Inc.*, 395 F. Supp. 3d 589, 604 (W.D. Pa. 2019) (questioning whether

the gist of the action doctrine is recognized by federal courts sitting in admiralty).  In *Blank River*

*Services,* the court concluded that even if the maritime contract at issue was appropriately

supplemented by substantive Pennsylvania law, which formally recognizes the gist of the action

doctrine, there was no basis upon which to extend a contract-based choice of law provision to the

tort claims before it.  *Id.* at 605.[8]  Neither party here has addressed the precise issue of what law

governs the application of the gist of the action doctrine, or whether federal maritime law

recognizes the doctrine.  Additional briefing is required.  The Court will thus defer its ruling on

Subbase's motion for summary judgment on CBM's negligence claim.

## IV.   CONCLUSION

For the reasons discussed above, and the premises considered, the following is ORDERED:

(1) Subbase Drydock, Inc.'s motion for summary judgment [ECF 101] IS DENIED as to
CBM's contract claim.

(2) The Court defers its ruling as to Subbase Drydock, Inc.'s motion for summary judgment
[ECF 101] as to CBM's negligence claim.

---

[8] The *Blank River Services* Court was also disinclined to find that the tort claims there would be barred by the gist of the action doctrine, even if the doctrine applied.  395 F. Supp. 3d at 605.  This was due both to the nature of the tort claims before it (conversion and negligent bailment), and because the matter was at the motion to dismiss stage, where pleading in the alternative was authorized.  *Id.*

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 17

     (3) The parties shall submit simultaneous briefs on the application of the gist of the action doctrine by federal courts sitting in admiralty by 3:00 p.m. on Wednesday, October 21, 2020.  Briefs should not exceed five (5) pages.

     (4) Crown Bay Marina, LP's cross motion for summary judgment [ECF 109] is DENIED.

**Dated**: October 16, 2020         S_____

                                       **RUTH MILLER**
                                       United States Magistrate Judge