IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| CROWN BAY MARINA, L.P., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil No. 2018-68 |
| vs. | ) | |
| | ) | |
| SUBBASE DRYDOCK, INC., *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **MEMORANDUM OPINION**

Hurricane Irma, a Category 5 storm, passed over St. Thomas in the U.S. Virgin Islands on September 6, 2017.  Two vessels in the custody of defendant Subbase Drydock, Inc. ("Subbase") were secured in plaintiff Crown Bay Marina, L.P.'s ("CBM") boat docking facility during the storm.  In this admiralty action, CBM seeks to recover from Subbase for damage it claims the vessels caused to the Crown Bay Marina ("the Marina").[1]  A bench trial was held on October 22, 26-30, 2020.  Following the trial, the parties submitted proposed findings of fact and conclusions of law to the Court.  [ECFs 219, 220].  The Court, having fully considered the testimonial, video, photographic and documentary evidence presented and admitted at trial, the arguments of counsel and the applicable law, makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

---

[1]  This case was consolidated for purposes of trial with *Crown Bay Marina, L.P. v. Reef Transportation LLC, et al.*, Civil Action 2018-73.  Unless otherwise indicated, the docket numbers referenced in this opinion refer to documents filed in this case, Civil Action 2018-68.

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 2

# I.   FINDINGS OF FACT

## A.   The Parties

## CBM

1.   CBM is a Delaware Limited Partnership with its principal place of business in Kirkland, Washington.  Joint Final Pretrial Order, Sec. IV., Admissions and Stipulations ("JFPTO") [ECF 171] at 36.

2.   CBM owns the Marina, which is located on St. Thomas in the U.S. Virgin Islands.  Oct. 27, 2020 Trial Tr. [ECF 217-2] at 170 (Ohno).[2]

3.   Kosei Ohno is the President of St. Thomas Marina Corporation, which is the general partner of CBM.  Oct. 27, 2020 Trial Tr. [ECF 217-2] at 168 (Ohno).

4.   Marina Management Services ("MMS") managed CBM from the time CBM took ownership of the facility in 1998 until shortly after Hurricanes Irma and Maria in September 2017.  JFPTO [ECF 171] at 38; Oct. 27, 2020 Trial Tr. [ECF 217-2] at 170 (Ohno).

5.   Since 1988, Dennis Kissman has been the President of MMS; he was also a limited partner in CBM.  Dec. 18, 2019 Dep. Tr. [ECF 208-1][3] at 7, 142 (Kissman).

6.   At the time of Hurricane Irma, Gerry Ocello was the Marina dockmaster.  Dec. 18, 2019 Dep. Tr. [ECF 208-1][4] at 101-02 (Kissman); Jan. 8, 2020 Dep. Tr. [ECF 209-1] at 8-9 (Ocello).

## Subbase

7.   Subbase is a U.S. Virgin Islands corporation with its principal place of business in the Virgin Islands.  JFPTO [ECF 171] at 36.

8.   Subbase is a marine repair and drydock facility.  July 30, 2019 Dep. Tr. [ECF 137-1] at 7 (Kral, Sr.).  It is located approximately 1/8 of a mile from the Marina.  Oct. 28, 2020 Trial Tr. [ECF 217-3] at 143 (Kral, Jr.).

---

[2]  Trial and designated deposition testimony are referred to by date, docket number, page number of docket entry, and witness in the following format: Oct. 27, 2020 Trial Tr. [ECF 217-2] at 190 (Ohno).  Exhibits referenced herein are to those admitted into evidence during the trial.

[3]  This citation is to the docket entry in Civil Action 2018-73.

[4]  This citation is to the docket entry in Civil Action 2018-73.

9.      Gene Kral, Jr. is the President of Subbase, and is a 50 percent owner in the business; he does not have a captain's license.  Oct. 26, 2020 Trial Tr. [ECF 217-1] at 16-17 (Kral, Jr.).

10.     Gene Kral, Sr. is the Secretary of Subbase.

## The Vessels

11.     Prior to Hurricane Irma, Subbase was the custodian of two ferries, the M/V Culebra II ("the Culebra II") and the M/V Caribeña ("the Caribeña").[5]  JFPTO [ECF 171] at 36.

12.     The Puerto Rico and Municipal Islands Maritime Transport Authority ("PRMTA") owns the Culebra II and the Caribeña.  Trial Ex. 12; Oct. 26, 2020 Trial Tr. [ECF 217-1] at 100-01 (Kral, Jr.).

13.     The Culebra II is 145 feet long with a beam of 27 feet and a draft of 9 feet.  JFPTO [ECF 171] at 38.

14.     There are five tie-up points on each side of the Culebra II.  Oct. 28, 2020 Trial Tr. [ECF 217-3] at 186 (Conway).

15.     The Caribeña is 100 feet long with a beam of 23 feet and a draft of 6 feet.  JFPTO [ECF 171] at 38.

16.     The Caribeña has four mooring cleats on each side of the vessel.  Oct. 28, 2020 Trial Tr. [ECF 217-3] at 193 (Conway).

17.     Both the Culebra II and the Caribeña have aluminum hulls, and each vessel has one anchor. Oct. 28, 2020 Trial Tr. [ECF 217-3] at 93, 130 (Kral, Jr.).

**B.      The Layout of the Marina**[6]

18.     The Marina consists of the following docks:  T1-Dock, T2-Dock, A-Dock, B-Dock, C-Dock, D-Dock, E-Dock, and a fuel dock.

19.     The T1, T2, A, and B docks are made primarily of concrete walls or "bulkheads," while the C-Dock, also made of concrete, consists of a pier extending out perpendicularly from the landside of the Marina, and is capped by another pier, known as the "T of C."

20.     Wooden crossbeams or "whalers" are affixed to the side of a bulkhead to provide a buffer between the bulkhead and the vessels that tie up alongside the bulkhead.

---

[5]  Prior to Hurricane Irma, both the Culebra II and the Caribeña were at the Subbase drydock undergoing repairs.

[6]  *See* Trial Ex. 54.

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 4

21.    The A, B, and C docks have slips or spaces for vessels to tie up.

22.    Narrow docks called "finger piers" separate certain slips.  These finger piers are identified by the slips on either side; thus, the finger pier between slip C9 and C11 is identified as the C9/C11 finger pier.

23.    The A-Dock is comprised of slips A1-A5.  The A-Dock contains one finger pier, located at A2/A3.

24.    The B-Dock is comprised of slips B1-B5.  The B-Dock contains one finger pier, located at B2/B3.

25.    The C-Dock consists of a dock for dinghies and 28 slips, numbered C4-C32.  Odd-numbered slips are on the west side of the dock and even-numbered slips are on the east side.

26.    The C-Dock and its finger piers are constructed on pairs of concrete pilings anchored to the sea floor.  Atop each pair of pilings is a concrete "piling cap."  Concrete decking bridges the gaps between the piling caps.

27.    Just off the end of most finger piers is a single fender piling or group of fender pilings, known as a "dolphin."  They stand vertically in the water and are not attached to the finger piers.  These can be used to assist with mooring in the slips.

28.    In certain locations, halfway between the fender pilings at the end of each set of finger piers is another piling or set of pilings that defines the two slips between the finger piers.

**C.    The Condition of the Marina Prior to Hurricane Irma**

29.    In 2014, Clyde Tapp,[7] a Marina employee, took underwater and water level photographs of various structures at the Marina.  Trial Exs. 402, 439; Oct. 30, 2020 Trial Tr. [ECF 217-5] at 15-16 (Tapp).  These photographs depict areas of the Marina, including the C-Dock and its pilings and piling caps, containing cracked and deteriorating concrete and rusted rebar.

30.    In October 2015, CBM contacted Mark Knopf,[8] a marine contractor, about replacing the fender pilings around the C-Dock.  Oct. 26, 2020 Trial Tr. [ECF 217-1] at 224 (Knopf).

---

[7]  Tapp first worked at the Marina from 2010 to 2012 as a member of its maintenance team.  Oct. 30, 2020 Trial Tr. [ECF 217-5] at 10 (Tapp).  He returned to the Marina as its operations manager from 2014 to 2016.  *Id.* (Tapp).  As operations manager, Tapp was responsible for the day to day operations of the Marina as well as maintenance.  *Id.* at 12-13 (Tapp).  Tapp was raised and still lives on Water Island.  *Id.* at 9 (Tapp).  He has been at or near the Marina most days of his life.  *Id.* at 13 (Tapp).

[8]  At the time, Knopf was the owner of Pro Mar Services, Inc. ("Pro Mar").  Oct. 26, 2020 Trial Tr. [ECF

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 5

31.     On August 17, 2016, Knopf emailed Kissman of CBM an estimate to replace the wooden fender piles on both sides of the C-Dock.  Trial Ex. 405; Oct. 26, 2020 Trial Tr. [ECF 217-1] at 225-26 (Knopf).

32.     On August 25, 2016, Kissman emailed Knopf to let him know that CBM was going to hold off making any repairs to the Marina until late Spring or early Summer of 2017.  Trial Ex. 407; Oct. 26, 2020 Trial Tr. [ECF 217-1] at 228-29 (Knopf).

33.     On August 9, 2017, Kissman emailed Knopf to let him know that all preparations Knopf was making for repairs to the Marina had to be put on hold per Ohno.  Trial Ex. 411; Oct. 26, 2020 Trial Tr. [ECF 217-1] at 231-32 (Knopf).

34.     On September 5, 2017, the day before Hurricane Irma hit St. Thomas, Herman van der Heide took aerial and ground level photographs of the Marina.[9]

35.     On September 5, 2017, there were two cleats and a utility box at the intersection of the A and T docks.  Trial Ex. 19.

36.     On September 5, 2017, there was no fender piling between slips B1 and B2.  Trial Ex. 13.

37.     Prior to Hurricane Irma, there were three individual dolphin piles at the outer end of the B-Dock slips.  Trial Ex. 13.  One pile was located at the end of the B2/B3 finger pier and the other two piles were located between the B2/B3 finger pier and the east wall of the B-Dock, marking the entrance to the B4 slip.

38.     On September 5, 2017, the skirting on the bulkhead side of the C7 slip was intact.  Trial Ex. 60.

39.     On September 5, 2017, there was a single fender pile between slips C7 and C9, and a single piling off of the C9/C11 finger pier.  Trial Ex. 13.

40.     On September 5, 2017, there were no fender pilings off the C13/C15 finger pier and no fender pilings on either side of the C13/C15 finger pier.  Trial Ex. 13.

---

217-1] at 123 (Knopf).  Knopf, a licensed general contractor specializing in marine contracting, founded Pro Mar in 1998 in the Virgin Islands.  *Id.* (Knopf).  The Court permitted Knopf to testify based on his knowledge of certain facts and based upon his expertise in the area of marine construction and repair.  *Id.* at 171.

    [9]  The parties stipulated that van der Heide is an expert in securing vessels for hurricanes.  [ECF 204] at 1.

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 6

D.      **Preparation for Hurricane Irma**

**Weather Conditions**

41.     On August 30, 2017, at 11:00 a.m. AST, the National Hurricane Center ("NHC")
        announced that a low-pressure area in the Atlantic Ocean had become Tropical Storm
        Irma.  JFPTO [ECF 171] at 38-39.

42.     On August 31, 2017, at 11:00 a.m. AST, the NHC announced that Tropical Storm Irma had
        become Hurricane Irma.  JFPTO [ECF 171] at 38-39.

43.     Between August 31, 2017 and September 4, 2017, Hurricane Irma fluctuated between
        being a Category 2 and a Category 3 storm.  JFPTO [ECF 171] at 38-40.

44.     On September 4, 2017, at 11:00 a.m. AST, the NHC issued a hurricane watch for the U.S.
        Virgin Islands.   JFPTO [ECF 171] at 41.

45.     On September 4, 2017, at 11:00 p.m. AST, the NHC issued hurricane warnings for Puerto
        Rico and the Virgin Islands.  JFPTO [ECF 171] at 41.

46.     On September 5, 2017 at 7:45 a.m. AST, the NHC announced that Hurricane Irma was a
        Category 5 storm.  JFPTO [ECF 171] at 41.

**Mooring the Vessels at the Marina**

47.     On September 3, 2017, Subbase hired a tow company to move the vessels from Subbase to
        the Marina.  JFPTO [ECF 171] at 38.

48.     Subbase also used a Subbase work boat, the M/V Vindicator ("the Vindicator"),[10] to help
        bring the vessels to the Marina.  Trial Ex. 13; Oct. 26, 2020 Trial Tr. [ECF 217-1] at 55-
        56 (Kral, Jr.).

49.     Subbase employees Kral, Jr., Kral, Sr., Michael Conway,[11] Gabriel Lowry, and Robert
        Lowe tied up the vessels at the Marina.  Oct. 26, 2020 Trial Tr. [ECF 217-1] at 46 (Kral,
        Jr.).

50.     After using the Vindicator to guide the vessels into the Marina, Subbase tied it to the aft
        port quarter of the Culebra II.  Trial Ex. 13; Oct. 26, 2020 Trial Tr. [ECF 217-1] at 55-56
        (Kral, Jr.).

---

[10]   The Vindicator was a 40-foot long metal hulled vessel.  Oct. 26, 2020 Trial Tr. [ECF 217-1] at 55-56
(Kral, Jr.).  It had a fender system that consisted of three tires affixed to each side of the vessel.  Trial Ex. 23; Oct. 28,
2020 Trial Tr. [ECF 217-3] at 95 (Kral, Jr.).

[11]   Conway is a project manager at Subbase; he handles Subbase's day to day operations.  Oct. 28, 2020 Trial
Tr. [ECF 217-3] at 183 (Conway).

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 7

51.     Subbase tied up the Culebra II parallel to the T2-Dock with the vessel's starboard side closest to the dock and its bow pointing toward the T1-Dock.  Trial Ex. 13.

52.     Subbase ran at least two lines from the Culebra II's bow to the T1-Dock.  Trial Ex. 59.

53.     Subbase ran a line from the Culebra II's stern to the second cleat on the T2-Dock starting from the corner where the T2-Dock and A-Dock meet.  Trial Ex. 19.

54.     The Culebra II's spring lines had long leads but the bow and stern lines had shorter leads. Oct. 27, 2020 Trial Tr. [ECF 217-2] at 17 (Bridges).[12]

55.     Subbase did not use chafing gear when tying off the Culebra II.[13]  JFPTO [ECF 171] at 37.

56.     Subbase tied up the Caribeña at slip B1 with its starboard side closest to the B1 bulkhead and its bow pointing out of the slip.  Trial Ex. 15; Oct. 28, 2020 Trial Tr. [ECF 217-3] at 126 (Kral, Jr.).

57.     Subbase tied a line from the Caribeña's starboard forward end to the end of the elbow between the A and B docks.  Trial Ex. 15.

58.     The lines running from the port side of the Caribeña to the B2/B3 finger pier were of varying materials, strengths, and conditions; the lines therefore had different breaking strengths, different safe working loads, and different elasticities.  Trial Ex. 21; Oct. 27, 2020 Trial Tr. [ECF 217-2] at 41-43 (Bridges).

59.     Two of the lines tied from the stern of the Caribeña to the B-Dock at slips B1 and B2 crossed each other; these two lines were of different diameters and materials.  Trial Ex. 20; Oct. 27, 2020 Trial Tr. [ECF 217-2] at 45 (Bridges).

60.     Four lines tied between the port side of the stern of the Caribeña passed through the same point or chock.  Trial Ex. 20.

61.     There were three small fenders tied to the Caribeña's starboard side.  Trial Ex. 29; Oct. 27, 2020 Trial Tr. [ECF 217-2] at 47 (Bridges).

62.     When tied up, the Caribeña's anchor was hanging over the bow.  Trial Ex. 28.

63.     Subbase did not use chafing gear in tying off the Caribeña.  JFPTO [ECF 171] at 37.

---

[12]  Captain Joseph Bridges is a maritime consultant based in Naples, Florida; the Court accepted him as an expert in mooring operations.  Oct. 27, 2020 Trial Tr. [ECF 217-2] at 7-8, 10 (Bridges).

[13]  Chafing gear, which can be made out of a variety of different materials such as fire hose, canvas, leather, or denim, is placed around lines at the point that they come into contact with other equipment on a vessel or dock; its purpose is to reduce friction and abrasion on the lines.  Oct. 27, 2020 Trial Tr. [ECF 217-2] at 19-20 (Bridges).

64.    Initially, Subbase secured tires to the sides of each vessel; it later removed them at Ocello's request and replaced them with different, smaller fenders it purchased for the vessels.  Oct. 28, 2020 Trial Tr. [ECF 217-3] at 99-100 (Kral, Jr.); Oct. 26, 2020 Trial Tr. [ECF 217-1] at 50 (Kral, Jr.).

65.    Ocello also suggested to Subbase that they add additional lines to the vessels or change the existing lines to stronger ones. Jan. 8, 2020 Dep. Tr. [209-1] at 223 (Ocello).[14]

66.    On September 5, 2017, Kral, Jr. returned to the Marina and went to the Marina office to sign various documents.  Oct. 28, 2020 Trial Tr. [ECF 217-3] at 126 (Kral, Jr.).

67.    While Kral, Jr. was in the Marina office, Subbase employees Conway, Lowe, Lowry, and Kral, Sr. put additional lines on both vessels.  Oct. 28, 2020 Trial Tr. [ECF 217-3] at 126-27 (Kral, Jr.); Oct. 26, 2020 Trial Tr. [ECF 217-1] at 62 (Kral, Jr.); Oct. 28, 2020 Trial Tr. [ECF 217-3] at 185-87 (Conway).

68.    While Kral, Jr. was in the Marina office, he phoned Arturo Viejo at PRMTA and told him that unless Kral, Jr. signed the CBM documents, the Marina would not allow the vessels to remain there during Hurricane Irma.[15]  Oct. 28, 2020 Trial Tr. [ECF 217-3] at 128 (Kral, Jr.).

69.    Kral, Jr. then executed three CBM documents per vessel.  Trial Exs. 1, 2.

70.    The first document, the License Agreement for Dockage ("the License Agreement"), is a two-page document that details the conditions under which dock space at the Marina may be occupied.[16]  Trial Ex. 1 at 1-2; Trial Ex. 2 at 1-2.

71.    In the paragraph that immediately precedes the "Agent/Owner's/Captain's Signature" block on the first page of the License Agreement, where Kral, Jr. signed, the document provides:

---

[14]  In this citation, the page number refers to the page number of the deposition, not the page number of the docket entry.

[15]  Since June 21, 2017, Subbase had been trying to get PRMTA to agree to a hurricane preparedness plan for 2017.  Trial Ex. 318; Oct. 28, 2020 Trial Tr. [ECF 217-3] at 105-06 (Kral, Jr.).  All Subbase customers were required to sign the same documents related to hurricane preparedness.  Oct. 28, 2020 Trial Tr. [ECF 217-3] at 111 (Kral, Jr.).  On August 30, 2017, Luis M. Abreu-Noble, Executive Director of PRMTA, provided Subbase with a "Statement of Responsibility and Waiver" for the Culebra II and the Caribeña.  Trial Ex. 12; Oct. 26, 2020 Trial Tr. [ECF 217-1] at 39 (Kral, Jr.).  This document allowed Subbase to take action to move PRMTA's vessels in the event of a storm.

[16]  In prior years, Kral, Jr. executed similar agreements with respect to the PRMTA vessels, including the Caribeña and the Culebra II, which Subbase brought to the Marina to moor for storms.  *See, e.g.*, Trial Ex. 3 at 1-2, 5-6, 18-19.

> Ownership and No Assignment:  The person who has signed this Agreement as Owner hereby represents and warrants that he is in fact and in law the true owner of the Vessel or the duly authorized or empowered agent of the Owner, and that he has full power and right to enter into this Agreement for himself and for the Vessel, and that there are no restrictions of any kind upon him or the Vessel which limit or restrict his right and power to bind himself and the Vessel to each and every term and condition of this Agreement.

Trial Ex. 1 at 1; Trial Ex. 2 at 1.

72.    In the first sentence of the section titled  "TERMS AND CONDITIONS," the License Agreement states that the Marina agrees to provide dockage space to the "Owner (herein defined as 'Owner' or 'Owner's Agent.')," on the terms in the License Agreement.  Trial Ex. 1 at 1; Trial Ex. 2 at 1.

73.    The License Agreement further provides:

> 4.    Owner warrants and represents that at all times during the term of this Agreement, the Vessel shall be maintained in a safe and seaworthy condition by Owner and shall be operated in a careful and safe manner so as not to cause damage to Marina's facilities or to any other property, vessel or persons.  . . .
>
> * * *
>
> 7.    Owner, at his sole cost and expense, agrees to procure and maintain in force during the entire term of this Agreement Indemnity Insurance covering the Vessel and protecting Owner and Marina against all claims, demands, suits and judgments in policy amounts of not less than $1,000,000 for claims arising within the coverage of said policies.  Owner's insurance policy shall specifically cover the risks undertaken in Paragraph 10 of this Agreement and the Owner or Owner's Agent agrees to name Marina as an additional insured.  . . .
>
> 8.    Storms and Other Emergencies:  The Owner shall make suitable arrangements for safe, sheltered anchorage during tropical storms, hurricanes or other inclement weather and Owner hereby warrants such arrangements have or will be made.  . . .
>
> * * *
>
> 10.    Owner shall be liable for all damages to the Boat Slip and other facilities owned by the Marina and other boats or vessels

> or persons on or about Marina's premises caused by the Vessel, Owner's employees, family, agents, invitees or guests (collectively referred to as the "Vessel's Parties").  . . .

Trial Ex. 1 at 1-2; Trial Ex. 2 at 1-2.

74. Subbase did not procure the insurance referred to in the License Agreement.  Oct. 26, 2020 Trial Tr. [ECF 217-1] at 22-23 (Kral, Jr.).

75. The second document, the Dayworker Agreement of Waiver of Liability and Assumption of Risk ("the Dayworker Agreement") is a one-page document that addresses liability for damages resulting from work performed by individuals not employed by the Marina on vessels berthed at the Marina.[17]  Trial Ex. 1 at 3; Trial Ex. 2 at 3.

76. The Dayworker Agreement states that it is "[t]o be signed by Owner/Captain."  Trial Ex. 1 at 3; Trial Ex. 2 at 3.  Kral, Jr. wrote "Representative" on the line immediately above the word "Title" on both Dayworker Agreements.  *Id.*

77. The third document, the Crown Bay Marina 2017 Hurricane Evacuation Protocol ("the Evacuation Protocol"), consists of one page.  It reproduces sections of paragraphs 8 and 10 of the License Agreement.  At the top of the Evacuation Protocol is a blank space for the "owner/agent of the vessel" to print his name.  At the bottom of the Evacuation Protocol is a signature block labeled "Owner/Owners [sic] Agent Signature."   The Evacuation Protocol contained the following additional language, printed in bold capital letters, at the bottom of the page: "**CROWN BAY MARINA SHOULD NOT BE CONSIDERED A SAFE HARBOR DURING TROPICAL WEATHER CONDITIONS.**"[18]  Trial Ex. 1 at 4; Trial Ex. 2 at 4.

78. Kral, Jr. printed his name at the top of each of the Evacuation Protocol documents and signed his name at the bottom of each.  Trial Ex. 1 at 4; Trial Ex. 2 at 4.

79. Subbase finished tying up both vessels just prior to dusk on September 5, 2017.  Oct. 28, 2020 Trial Tr. [ECF 217-3] at 129 (Kral, Jr.).

80. CBM charged Subbase $2,000 per day per vessel for docking the Caribeña and the Culebra II during Hurricane Irma.  Oct. 28, 2020 Trial Tr. [ECF 217-3] at 117 (Kral, Jr.).

---

[17]  In 2014, Kral, Jr. executed similar agreements with respect to PRMTA vessels he brought to the Marina to moor for storms.  Trial Ex. 3 at 3, 7.  Kral, Jr. signed the documents, printed his name, and identified himself as the vessel's "Rep" on the line for the "Title" of the person signing the documents.  *Id.*  In 2016, when Kral, Jr. executed the Dayworker Agreement for the Culebra II, he identified himself as the vessel's "Owner" on the document.  *Id.* at 20.

[18]  The "Crown Bay Marina Hurricane Evacuation Protocol"  Kral, Jr. signed on October 13, 2014 did not contain the "safe harbor" language.  Trial Ex. 3 at 8.

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 11

81.    Subbase paid the dockage fees for both vessels on September 5, 2017.  Trial Ex. 1 at 1-2;
       Trial Ex. 2 at 1-2; Oct. 26, 2020 Trial Tr. [ECF 217-1] at 21, 38 (Kral, Jr.).

82.    CBM personnel knew that Subbase did not own the ferry vessels.  JFPTO [ECF 171] at 38.

**E.    The Condition of the Vessels and the Marina Following Hurricane Irma**

83.    On September 6, 2017, Hurricane Irma hit St. Thomas.  The following vessels were tied
       up at the Marina when Hurricane Irma struck:  (1) the Culebra II at the T2-Dock, with the
       Vindicator tied alongside; (2) a sailboat belonging to Ocello in slips A1 and A2; (3) the
       Sea Tow in slip A5; (4) the Caribeña in slip B1; (5) the M/V LSJ in slip B3; (6) the Run
       Aweigh in slip B5; (7) the M/V Evening Star in slip C10; (8) the M/V Morning Star in slip
       C12; and (9) the M/V Sky Fall in slip C26.[19]

84.    During the storm, the Caribeña became unmoored.  JFPTO [ECF 171] at 37.

85.    The Caribeña ended up against the west side of the C-Dock.  Trial Exs. 37, 41.

86.    During the storm, vessels moored in the B-Dock slips struck the bulkhead of the B-Dock,
       damaging the concrete.  Trial Ex. 317 at 7;  Oct. 22, 2020 Trial Tr. [ECF 217] at 51
       (Ferreras).

87.    A portion of the B2/B3 finger pier was damaged in Hurricane Irma.  Oct. 22, 2020 Trial
       Tr. [ECF 217] at 57 (Ferreras).

88.    On its way from the B1 slip to its eventual resting spot on the C-Dock, the Caribeña
       knocked over three dolphin piles in front of the B-Dock slips.  Oct. 22, 2020 Trial Tr. [ECF
       217] at 48-50 (Ferreras).

89.    The skirting on the bulkhead side of the C7 slip was damaged in Hurricane Irma.  Trial Ex.
       354; Oct. 26, 2020 Trial Tr. [ECF 217-1] at 251-52 (Knopf).

90.    The Caribeña made contact with the Run Aweigh.  Trial Exs. 25, 48 (Video).  The Run
       Aweigh's anchor, which was on its bow before the storm, became embedded in the forward
       port side of the Caribeña.  Trial Ex. 48 (Video).

91.    The Caribeña ended up where the C9/C11 and C13/15 finger piers had been located before
       the storm.  Trial Exs. 49 (Video), 54.

92.    The piling off the end of the C9/C11 finger pier remained in place following the storm.
       Trial Ex. 354.

93.    The Caribeña sustained three punctures to the port side of its hull; two were at the water

---

[19]  CBM allowed 16 vessels to moor in the Marina for Hurricane Irma.  Trial Exs. 339, 432.

line and one was at the height of the electrical box on the C-Dock.  Oct. 28, 2020 Trial Tr. [ECF 217-3] at 93-94 (Kral, Jr.).  The Caribeña also suffered damage to a section located near the handrail on the vessel's rear port quarter.  *Id.* at 94 (Kral, Jr.).  The stern of the Caribeña did not appear damaged.  Trial Ex. 49 (Video).

94.   After the storm, the LSJ was located against and parallel to the bulkhead of the B-Dock, across slips B3, B4, and B5.  Trial Ex. 40.  The LSJ had dents above the water line starting from about five feet from the bow down the length of the port side of the vessel.  Oct. 28, 2020 Trial Tr. [ECF 217-3] at 92-94 (Kral, Jr.)

95.   After the storm, the Run Aweigh remained in the same slip where she had been tied up originally, although she was further out from the bulkhead.  Trial Ex. 40.

96.   The storm exerted both horizontal/shear and vertical/tensile forces on the Culebra II's lines with short leads.  Oct. 22, 2020 Trial Tr. [ECF 217] at 36 (Ferreras).

97.   During the storm, the Culebra II broke free at the stern and rotated about its bow; either it or the Vindicator then contacted the T1-Dock.  Trial Ex. 53 (Video); Oct. 22, 2020 Trial Tr. [ECF 217] at 32 (Ferreras).

98.   When the Culebra II/Vindicator hit the T1-Dock, it damaged a cleat and a utility box.  Trial Exs. 35, 51 (Video); Oct. 22, 2020 Trial Tr. [ECF 217] at 39-40, 45-47 (Ferreras).

99.   At approximately midday on September 6, 2017, the Culebra II became unmoored.  Trial Ex. 53 (Video);[20] JFPTO [ECF 171] at 37.

100.   The Culebra II ended up outside the Marina, where it sank with the Vindicator beneath it.  Oct. 28, 2020 Trial Tr. [ECF 217-3] at 96-97 (Kral, Jr.); Trial Ex. 432 at 21.

**F.   Damage Assessment and Restoration of the Marina Following Hurricanes Irma and Maria**

101.   Hurricane Maria hit St. Thomas on September 16, 2017 as a Category 5 storm.

102.   There was a storm surge of several feet during Hurricane Maria.  Oct. 28, 2020 Trial Tr. [ECF 217-3] at 142-43 (Kral, Jr.)

103.   CBM retained engineer Paul Ferreras to provide a damage assessment of the Marina following Hurricanes Irma and Maria.  Oct. 22, 2020 Trial Tr. [ECF 217] at 12, 18 (Ferreras).[21]

---

[20] The video footage came from a CBM security camera mounted on the roof of Tickles, a restaurant adjacent to the Marina.  Oct. 27, 2020 Trial Tr. [ECF 217-2] at 219 (Ohno).

[21] Ferreras of Paul Ferreras PE, Inc. is a structural engineer who was qualified at trial as an expert forensic

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 13

104.    On November 20, 2017, and on several other occasions over a two to three-day period, Ferreras and his employee, Keith Pomeroy,[22] physically inspected the Marina.  Oct. 22, 2020 Trial Tr. [ECF 217] at 20 (Ferreras).

105.    Ferreras and Pomeroy worked with an outside consultant, Fran Woods, to provide an engineer's estimate and cost analysis related to the damage at the Marina.  Oct. 22, 2020 Trial Tr. [ECF 217] at 19, 79, 180 (Ferreras).

106.    On December 19, 2017, Ferreras provided CBM with his initial damage assessment.  Trial Ex. 429 at 1.  He provided a revised damage assessment on January 10, 2018.  Oct. 22, 2020 Trial Tr. [ECF 217] at 179-80 (Ferreras).

107.    CBM also contacted Knopf shortly after Hurricane Irma to ask him for an estimate for repairs to the Marina.  Oct. 26, 2020 Trial Tr. [ECF 217-1] at 125-26 (Knopf).

108.    The first time Knopf saw the Marina following Hurricane Irma was on October 4, 2017, after he came back to the island and went to assess the damage.  He returned to the Marina several days later to further assess the scope of needed repairs.  Oct. 26, 2020 Trial Tr. [ECF 217-1] at 126 (Knopf).

109.    On October 27, 2017, CBM entered into a contract with Knopf to make temporary repairs to the Marina, for a total cost of $408,148.  Trial Ex. 81; Oct. 26, 2020 Trial Tr. [ECF 217-1] at 127-29 (Knopf).  That contract included two Change Orders, valued at $108,672.  Trial Exs. 82, 85.  Work was performed and CBM paid Knopf's invoices.

110.    On February 12, 2018, Knopf provided CBM with a storm-related permanent repairs estimate.  On June 25, 2020, at Ohno's request, Knopf provided CBM with a revised statement of the repair costs detailed in his February 12, 2018 estimate.[23]  Oct. 26, 2020 Trial Tr. [ECF 217-1] at 151-52, 159-60 (Knopf).

111.    Sometime in December 2017, power to the C-Dock was restored.  Oct. 28, 2020 Trial Tr. [ECF 217-3] at 34 (Ohno).

---

engineer.  Oct. 22, 2020 Trial Tr. [ECF 217] at 12-16 (Ferreras), and 27.

[22]  Pomeroy is a civil engineer with a 100-ton U.S. Coast Guard captain's license.  Oct. 22, 2020 Trial Tr. [ECF 217] at 25-26 (Ferreras).

[23]  At the time Knopf provided the revised estimate, he was the owner of Marine Consultants LLC, a marine construction consulting company.  Trial Ex. 78; Oct. 26, 2020 Trial Tr. [ECF 217-1] at 159-60 (Knopf).  While Exhibit 78 was not admitted in evidence, Knopf was permitted to testify at length as to his estimates of costs, as included in his revision.

112.   Twenty slips at the Marina that were damaged in Hurricanes Irma and Maria became available for use by the public in March or April of 2018.  Oct. 28, 2020 Trial Tr. [ECF 217-3] at 46 (Ohno).

113.   CBM demanded Subbase pay for damage CBM claimed the Culebra II and the Caribeña caused; Subbase refused to pay CBM.  JFPTO [ECF 171] at 37.

## II.   CONCLUSIONS OF LAW

### A.   Legal Standards

District courts of the United States "have original jurisdiction . . . of [a]ny civil case of . . . maritime jurisdiction." 28 U.S.C. § 1333(1).[24]  "The fundamental interest giving rise to maritime jurisdiction is the protection of maritime commerce." *Hargus v. Ferocious & Impetuous, LLC*, 840 F.3d 133, 136 (3d Cir. 2016) (quotation marks omitted).  In determining whether admiralty jurisdiction exists, the court applies substantive federal admiralty law.  *Interested Underwriters at Lloyd's v. Haulover Marine, Inc.*, 866 F. Supp. 235, 236-37 (D.V.I. 1994).

### 1.   Maritime Tort Claims

"For a federal court to have admiralty jurisdiction over a tort claim, the tort must (1) occur on navigable waters and (2) bear some relationship to traditional maritime activity." *Andreu v. Palmas del Mar Homeowners Ass'n, Inc.*, 311 F. Supp. 3d 456, 459 (D.P.R. 2018) (citing *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995)).  Navigable waters are those which, on their own or in conjunction with others, form "a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water." *Andreu*, 311 F. Supp. 3d at 459-60 (quoting *The Daniel Ball*, 77 U.S. 557, 563 (1870)).  Torts bear a relationship to traditional maritime activity if

---

[24]   Under 48 U.S.C. § 1612(a), the District Court of the Virgin Islands has the same "jurisdiction of a District Court of the United States."

the incident could potentially disrupt maritime commerce and if "the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Andreu*, 311 F. Supp. 3d at 460-61 (quoting *Grubart*, 513 U.S. at 534).

In this case, CBM's tort claims related to the mooring of the Culebra II and the Caribeña are governed by federal admiralty law.  First, the general features of the incident—damage to a marina located on navigable waters allegedly caused by commercial vessels docked at that marina during a hurricane—could potentially disrupt commercial activity.  *See Sisson v. Ruby*, 497 U.S. 358, 363 (1990) ("Here, the general features [of the incident]—a fire on a vessel docked at a marina on navigable waters—plainly satisfy the requirement of potential disruption to commercial maritime activity.").  Second, the mooring of vessels at a marina situated on navigable waters is substantially related to traditional maritime activity.  *See id.* at 367 ("Clearly, the storage and maintenance of a vessel at a marina on navigable waters is substantially related to 'traditional maritime activity' given the broad perspective demanded by the second aspect of the test.  Docking a vessel at a marina on a navigable waterway is a common, if not indispensable, maritime activity.").

CBM's tort claim sounds in negligence.  The elements of a negligence claim under admiralty law are as follows:

> "(1) 'the existence of a duty required by law which obliges the person to conform to a certain standard of conduct'; (2) 'a breach of that duty by engaging in conduct that falls below the applicable standard or norm'; (3) a resulting loss or injury to the plaintiff; and (4) 'a reasonably close causal connection between the offending conduct and the resulting injury.'"  [*In re Frescati Shipping Co. v. Citgo Asphalt Ref. Co.,* 718 F.3d 184, 207 (3d Cir. 2013)] (alterations omitted) (quoting 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law*, §§ 5–2, at 252 (5th ed. 2011)).

*Pogan v. M/V Venture Pride*, 2018 WL 1548687, at *2 (D.V.I. Mar. 28, 2018).[25]  "Under the general principles of negligence, mariners are expected to exercise human skill and precaution, and a proper display of nautical skill, *i.e.*, reasonable care under the circumstances." *Id.* (quotation marks omitted);[26] *see also* 2 Thomas J. Schoenbaum, *Admiralty & Maritime Law*, § 14-2 (5th ed. 2011) ("The test and standard for a finding of negligence is reasonable care under the circumstances, or whether judged against the standard of good and prudent seamanship, the collision could have been prevented by the exercise of due care." (quoted in *Pogan, 2*018 WL 1548687, at *2) (footnotes omitted).  In the context of hurricane preparedness, reasonable care has been interpreted to mean "whether the owner use[d] all reasonable means and took proper action to guard against, prevent or mitigate the dangers posed by the hurricane."  *Fischer v. S/Y NERAIDA*, 508 F.3d 586, 594 (11th Cir. 2007) (quotation marks omitted).  "Although what 'reasonable care' requires changes with the circumstances, that standard recognizes the existence in every case of something more that could be done—and perhaps would be legally required under a 'highest degree of caution' standard—but that reasonable care does not demand."  *Id.*

Under the *Louisiana* Rule,[27] when a vessel moving as a result of an external force such as a current or wind allides with a stationary object, the moving vessel is presumptively at fault.

---

[25] The elements of maritime negligence are essentially the same as those for common law negligence.  *See Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811, 815 (2001) (explaining "common-law duties of care . . . have been adjusted to fit their maritime context"); *Frescati Shipping Co.*, 718 F.3d at 207 ("Negligence in admiralty law is essentially coextensive with its common law counterpart . . . ."); *Galentine v. Estate of Stekervetz*, 273 F. Supp. 2d 538, 544 (D. Del. 2003) ("Under general federal maritime law, negligence is an actionable wrong.").

[26] "Generally, in admiralty, the duty of care may be derived from 1) duly enacted laws, regulations and rules; 2) custom; or 3) the dictates of reasonableness and prudence."  *Galentine*, 273 F. Supp. 2d at 544.

[27] Although the Third Circuit has not expressly adopted the *Louisiana* Rule, it is a well-established principle in admiralty law.  *See Hatt 65, LLC v. Kreitzberg*, 658 F.3d 1243, 1248-49 (11th Cir. 2011); *In re Signal Intern., LLC*, 579 F.3d 478, 490 n.11 (5th Cir.2009); *Hood v. Knappton Corp., Inc.*, 986 F.2d 329, 332 (9th Cir. 1993); *Patapsco Scrap Corp. v. Md. Shipbuilding & Drydock Co.*, 268 F.2d 817, 819 (4th Cir. 1959).

*Fischer*, 508 F.3d at 593 (citing *The Louisiana*, 70 U.S. 164, 173 (1865)).  Once the rule is applied, it creates a rebuttable presumption of negligence.  *Fischer*, 508 F.3d at 593.  To defeat the presumption, the defendant must demonstrate "[1] that the allision was the fault of the stationary object[;] [2] that the moving vessel acted with reasonable care[;] or [3] that the allision was an unavoidable accident."  *Id.*  In all cases, maritime negligence is actionable only if it is a legal cause of the plaintiff's injuries—that is, "the negligence must be a substantial factor in causing the injuries."  *Great Lakes Dredge & Dock Co. LLC v. La. State*, 624 F.3d 201, 214 (5th Cir. 2010) (quotation marks omitted); *accord Revak v. Interforest Terminal UMEA AB*, 2009 WL 1410278, at *5 (E.D. Pa. May 14, 2009) (the inquiry considers not only factual causation—whether the "event would have occurred in the absence of an act or omission," but also proximate causation— whether "the damage was a reasonably foreseeable consequence" of the act or omission) (quotation marks omitted).  "Finally, actual economic loss, injury, or damages suffered by the plaintiff must be specifically demonstrated."  *Galentine*, 273 F. Supp. 2d at 544.

## 2.   <u>Maritime Contract Claims</u>

Where the court has admiralty jurisdiction over a contract claim, the court must apply federal choice of law rules to determine the applicable law.  *Calhoun v. Yamaha Motor Corp., U.S.A.*, 216 F.3d 338, 343 (3d Cir. 2000); *accord State Trading Corp. of India v. Assuranceforeningen Skuld*, 921 F.2d 409, 414 (2d Cir. 1990) ("A federal court sitting in admiralty must apply federal choice of law rules.").  "[C]ourts apply federal choice-of-law rules by 'ascertaining and valuing points of contact between the transaction and the states or governments whose competing laws are involved.'"  *Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC*, 324 F. Supp. 3d 366, 383-84 (W.D.N.Y. 2018) (quoting *Lauritzen v. Larsen*, 345 U.S. 571, 582 (1953)).  Those points of contact are "(1) any choice-of-law provision contained in the

contract; (2) the place where the contract was negotiated, issued, and signed; (3) the place of

performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence,

nationality, place of incorporation, and place of business of the parties." *Advani Enters., Inc. v.*

*Underwriters at Lloyds*, 140 F.3d 157, 162 (2d Cir. 1998).[28]

"[W]hen a maritime contract contains a choice-of-law clause, the law chosen by the parties

governs . . . unless (1) that jurisdiction has no substantial relationship to the parties or the

transaction or (2) that jurisdiction's law conflicts with the fundamental purposes of maritime law

. . . ." *Farrell Lines Inc. v. Columbus Cello-Poly Corp.*, 32 F. Supp. 2d 118, 127 (S.D.N.Y. 1997)

(citations and quotation marks omitted). In other words, "[t]he fact that a choice-of-laws provision

exists in a contract does not, by itself, remove the contract from the scope of maritime law."

*Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 49 (2d Cir. 2008). Rather, "once a contract has

been deemed a maritime contract, the next step is determining whether a specific state's laws

should be used to *supplement* any area of contract law for which federal common law does not

provide." *Id.* (emphasis in original).

Here, CBM is suing Subbase for breach of the License Agreement and the Evacuation

Protocol. Ver. Compl. [ECF 1] ¶¶ 16, 17, 27, 31, 32. Paragraph 17 of the License Agreement

provides that the agreement "shall be governed by, construed and enforced in accordance with the

Laws of the Territory of the U.S. Virgin Islands and the United States of America." *See, e.g.*,

[ECF 110-3] at 2. Unlike the License Agreement, the Evacuation Protocol does not contain a

choice of law provision. Nevertheless, (1) the Evacuation Protocol was issued and signed in the

Virgin Islands; (2) the agreement was performed in the Virgin Islands; (3) the subject matter of

---

[28] When a maritime contract does not contain a choice-of-law provision, the court simply skips the first factor. *Travelers Prop. Cas. Co. of Am.*, 324 F. Supp. 3d at 384.

the contract—evacuation protocols for vessels stored at the Marina—is located in the Virgin Islands; and (4) both CBM and Subbase are located in the Virgin Islands, with Subbase being incorporated in the Virgin Islands.  Thus, because "all writings that are part of the same transaction are interpreted together," *Sunshine Shopping Ctr., Inc. v. Kmart Corp.*, 85 F. Supp. 2d 537, 541 (D.V.I. 2000) (citation and quotation marks omitted), both agreements are governed by federal maritime law possibly supplemented with Virgin Islands law.

"[O]ur interpretation of maritime contracts sounds in federal common law, so we look to the general common law of contracts." *Internaves de Mex. s.a. de C.V. v. Andromeda S.S. Corp.*, 898 F.3d 1087, 1093 (11th Cir. 2018).  Under the federal common law, "[t]he elements of a breach of contract claim are the existence of a contract, material breach, and damages." *Kol B'Seder, Inc. v. Certain Underwriters at Lloyd's of London Subscribing to Certificate No. 154766 Under Contract No. B0621MASRSWV15BND*, 766 F. App'x 795, 803 (11th Cir. 2019).   These are essentially the same elements specified by Virgin Islands law.  *See Benjamin v. Gov't of the V.I.*, 2020 WL 1426691, at *4 (V.I. Super. Mar. 16, 2020) (noting that the elements for a breach of contract are "(1) the existence of a contract; (2) a contractually created duty; (3) a breach of that duty; and (4) damages suffered due to that breach.").

"Generally, in applying principles of contract interpretation, a court must first determine whether the [contract's] language states the parties' intentions clearly and unambiguously." *Atlantic Basin Ref. Inc. v. Arclight Capital Partners, LLC et al.*, 2018 WL 3431974, at *7 (D.V.I. July 16, 2018) (applying Virgin Islands law).   "To be unambiguous, an agreement must be reasonably capable of only one construction."  *Addie v. Kjaer*, 2009 WL 482497, at *5 (D.V.I. Feb. 23, 2009) (quoting *Washington Hosp. v. White*, 889 F.2d 1294, 1301 (3d Cir. 1989) (quotation marks omitted)).   "Whether the contract is ambiguous is a question of law, but 'if the terms are

ambiguous, the issue of the meaning of the terms becomes a question of fact.'" *H.D.V.I. Holding Co., Inc. v. CDP, LLC*, 2018 WL 3213138, at *4 (D.V.I. June 29, 2018) (quoting *United Corp. v. Tutu Park Ltd.*, 55 V.I. 702, 707 (2011)). Whether a contract is ambiguous is informed by reference to extrinsic evidence of the contracting parties' intent, such as their conduct. *H.D.V.I. Holding Co., Inc.*, 2018 WL 3213138, at *5.

## B.   Analysis

### 1.   The Tort Claim

#### a.   The Caribeña

The Caribeña was initially tied up in the B1 slip. After it broke free from its moorings during Hurricane Irma, it knocked over three dolphin piles off the B-Dock, hit the finger piers at C9/C11 and C13/C15, and then hit the C-Dock. After the storm, the vessel was found in the water, parallel to and against the western side of the C-Dock. Because the Caribeña allided with various stationary structures at the Marina, under the *Louisiana* Rule, Subbase must rebut the presumption of negligence. The Court finds that Subbase introduced enough evidence regarding its mooring and securing of the vessel to counter the presumption of negligence. Thus, the Court concludes that, with respect to the Caribeña, Subbase acted with the requisite care under the circumstances.[29]

CBM, through the testimony of Captain Bridges, criticized the steps Subbase took to secure the vessel. For example, Bridges opined that the vessel was tied off too close to the dock wall on the west side of the B1 slip. Oct. 27, 2020 Trial Tr. [ECF 217-2] at 40 (Bridges). Bridges also noted that Subbase did not use chafing gear and created a risk of chafing at several points on the

---

[29] Subbase was not required to take every possible precaution when tying off the vessels; it was only required to take those measures that a mariner exercising reasonable care in those circumstances would have taken.

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 21

vessel by running multiple lines out of the same chocks in the vessel's hull, rather than separating them where possible. *Id.* at 46 (Bridges). Further, Bridges pointed out that Subbase did not balance the number of lines leading from the starboard side of the Caribeña with an adequate number of lines on the port side, and that the fenders used were too small for a vessel its size. *Id.* at 46-47, 54-55 (Bridges).

On cross-examination, however, Bridges conceded that in his experience securing vessels for hurricanes, he sometimes secured them to a dock on one side with no lines secured on the other side. Oct. 27, 2020 Trial Tr. [ECF 217-2] at 89 (Bridges).[30] In addition, van der Heide, the parties' stipulated expert in securing vessels for hurricanes,[31] concluded that luck was the major factor in surviving a Category 5 storm, such as Hurricane Irma. In his book, "Hurricane Survival Guide for Mariners," which the parties agree is an "authoritative reference" about preparing vessels for hurricanes, van der Heide wrote the following with respect to Category 5 storm conditions:

> All boats have serious problems being attached to their moorings. In all areas, boats will break free . . . . Very serious chafing and breaking of any anchor or mooring rope and constant failure of anchor and mooring chains. Cleats are being ripped out of the deck and the dock. . . . The docks in marinas will be under water . . . . Luck is THE major factor whether the boat and its crew will survive the nightmare at all. Neither man nor machine has any influence on the outcome of the ordeal!!

Tr. Ex. 360 at 11. And while van der Heide testified that such conditions do not relieve a vessel's master from "doing everything within reason to secure the vessel," June 10, 2020 Dep. Tr. [ECF

---

[30] It was also apparent from the evidence that Bridges based his opinions regarding the number and placement of mooring lines on photographs taken prior to when Subbase completed its tie up late on September 5, 2017.

[31] [ECF 204] at 1.

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 22

204] at 2, the Court is persuaded, given all the evidence before it, that Subbase fulfilled that duty

with respect to the Caribeña.

      **b.**      **The Culebra II**

The Culebra II was tied up alongside the T2-Dock prior to Hurricane Irma.  After it broke

free at the stern from its mooring, either it or the Vindicator, which was tied to it, hit the T1-Dock.

Because either the Culebra II or the Vindicator allided with the T1-Dock, under the *Louisiana*

Rule, Subbase must rebut the presumption of negligence.

Here, the Court once again finds that the evidence shows that Subbase took those measures

that a mariner exercising reasonable care under the circumstances—including the vessel's

configuration and the available dock space—would have taken.[32]  Although Subbase's tying the

40-foot-long Vindicator to the Culebra II might give one pause, Oct. 27, 2020 Trial Tr. [ECF 217-

2] at 14 (Bridges), the Court heard testimony that there were tire marks on the T1-Dock after the

storm.[33]  That might mean that the Vindicator, which had tires affixed to its sides,[34] was what

impacted the dock, as opposed to the Culebra II, or that it at least softened the blow.  From that,

the Court could conclude that the Vindicator acted as a fender, thereby preventing further damage

to the T1-Dock by the 145-foot Culebra II.  In any event, as CBM provided no evidence of the

---

[32] *See In re Matter of Complaint of Atl. Marine Prop. Holding Co., Inc.*, 570 F. Supp. 2d 1369, 1377 (S.D. Al. 2008) ("There is clearly no agreement as to what preparations would have protected [a barge and its cargo, another vessel,] from breaking away, much less what should 'reasonably' have been done to protect [them].  The only clear fact is that the preparations actually made were insufficient since the moorings failed.").

[33] Oct. 28, 2020 Trial Tr. [ECF 217-3] at 98 (Kral, Jr.).  There was also  testimony that there was some blue paint observed on the T-Dock.  Oct. 22, 2020 Trial. Tr. [ECF 217] at 222.

[34] Oct. 28, 2020 Trial Tr. [ECF 217-3] at 95-96 (Kral, Jr.).

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 23

harm that might have been foreseeable as a result of Subbase's tying the Vindicator to the Culebra II, this Court does not find that action necessarily to be negligent.

CBM also criticized Subbase for tying the Culebra II close to the T2-Dock, thus inhibiting the vessel from moving about during the storm.[35]   Trial Tr. Oct. 27, 2020 [ECF 217-2] at 15 (Bridges).   Bridges opined that the "better option would have been to move off of T-2 dock into the center of that channel between the dock wall at T-2 and those mooring dolphins off of C dock." *Id*.   The evidence highlighted several problems with Bridges' reasoning.   First, the vessel would have been tied across the entrance to the Marina, thus blocking ingress and egress.   *See* Trial Ex. 54.   Next, Bridges conceded that he had previously tied up vessels for storms in essentially the same manner that the Culebra II was secured.   Oct. 27, 2020 Trial Tr. [ECF 217-2] at 89 (Bridges). Further, Ferreras testified that the winds were predominantly from the west,[36] which would have kept the vessel mostly off the dock, rather than slamming into it.

Finally, Bridges took issue with the lengths and numbers of lines Subbase used to secure the vessel and criticized Subbase for not using every possible cleat, or any chafing gear.   Oct. 27, 2020 Trial Tr. [ECF 217-2] at 19-20, 26, 36-37 (Bridges).   However, the evidence was that Bridges got his information regarding the mooring configuration from photographs taken prior to the time Subbase completed the mooring late on September 5, 2017.   Furthermore, given van der Heide's description of the effects of a Category 5 storm, the Court cannot find that the ultimate impact on the Culebra II, and thus on the Marina, would have been any different had Subbase taken all the

---

[35]   Ferreras observed through photographs that "the vessel is only inches from the dock and the forces on those lines are going to be both horizontal and vertical. . . .   When you combine tensile and lateral forces [], it's a much more, it's a more detrimental to a break out, a blow up of the anchorage."   Oct. 22, 2020 Trial Tr. [ECF 217] at 36 (Ferreras).

[36]   Oct. 22, 2020 Trial Tr. [ECF 217] at 146 (Ferreras).

steps Bridges thought appropriate.  As van der Heide instructed, there was virtually nothing more that Subbase could have done in Category 5 conditions to affect the outcome.

On this record, the Court does not find that Subbase breached a duty to use reasonable care under the circumstances.  2 Thomas J. Schoenbaum, *Admiralty & Maritime Law*, § 14-2 (5th ed. 2011) ("The test and standard for a finding of negligence is reasonable care under the circumstances, or whether judged against the standard of good and prudent seamanship, the collision could have been prevented by the exercise of due care.") (footnotes omitted).  Although CBM urged that negligence could be found simply from the act of leaving a vessel Culebra II's size in the Marina for a Category 5 hurricane, the fact is that CBM allowed it to come into the Marina for the storm, and CBM received compensation for that action.

Thus, the Court concludes that CBM has not proven that Subbase was negligent.

## 2.     The Breach of Contract Claim

CBM claims that Subbase breached the terms of the License Agreement and the Evacuation Protocol by failing to pay for damage to the Marina caused by the Caribeña and the Culebra II.[37] Ver. Compl. [ECF 1] ¶¶ 16, 17, 27, 31, 32.  According to CBM, Subbase is liable under the contracts as the "Owner" or the "Owner's Agent."  Alternatively, CBM argues that if the terms of the contract are deemed ambiguous, the evidence adduced at trial of the parties' previous course of dealings demonstrates that Subbase understood its liability to CBM as PRMTA's agent.

---

[37] In its proposed findings of fact and conclusions of law, CBM alleges that Subbase is also liable for breach of contract by failing to name CBM as an insured on its policy and by failing to disclose PRMTA's ownership of the vessels.  [ECF 219] ¶¶ 13, 17.  As previously noted, however, the Court finds CBM knew that PRMTA owned the vessels.  In addition, CBM fails to demonstrate how it was damaged by these alleged breaches, separate and apart from the damage it suffered as a result of Subbase's failure to pay for damage the vessels caused.  Therefore, the Court does not consider these additional allegations separately.

Subbase argues against both positions.  The first issue, therefore, is whether Subbase, as PRMTA's agent, is liable under these agreements.

The License Agreement states as follows:  "Crown Bay Marina . . . hereby agrees to provide the Owner (herein defined as 'Owner' or 'Owner's Agent') and Owner hereby agrees to accept from Marina dockage space at the boat slip assigned by Marina . . . all upon the terms and subject to the conditions set forth below."  Trial Ex. 1 at 1; Trial Ex. 2 at 1.  Thus, under the express terms of the contract, an individual who brings a vessel to the Marina for dockage, whether that individual is the vessel's owner or an agent for the vessel's owner, is liable to CBM pursuant to the terms of the agreement.  The term "Owner," as used in the Evacuation Protocol has the same meaning.  "It is a general rule of contract law that where two writings are executed at the same time and are intertwined by the same subject matter, they should be construed together, and interpreted as a whole, each one contributing to the ascertainment of the true intent of the parties.'" *Phillip v. Marsh-Monsanto*, 2017 WL 2334248, at *6 (V.I. May 30, 2017) (quoting *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 107-08 (3d Cir. 1986) (quotation marks omitted)).  Having determined that Subbase signed the agreements as the "Owner," as defined in the agreements, the next issue is whether and to what extent Subbase is liable under those agreements.

Both the License Agreement and the Evacuation Protocol further provide that the Owner— as defined in the License Agreement—shall be liable to CBM for damages to the Marina caused by the subject vessel.  In the License Agreement, that liability is imposed in the first sentence of Paragraph 10 of the agreement:  "Owner shall be liable for all damages to the Boat Slip and other facilities owned by the Marina and other boats or vessels or persons on or about Marina's premises caused by the Vessel, Owner's employees, family, agents, invitees or guests . . . ."  Trial Ex. 1 at

2; Trial Ex. 2 at 2.  In the Evacuation Protocol, that liability is imposed in Paragraph 5:  "The Owner shall be liable for all damages to the Boat Slip and other facilities owned by the Marina and other boats or vessels or persons on or about Marina's premises caused by the Vessel, Owner's employees, family, agents, invitees or guests . . . ."  Trial Ex. 1 at 4.

Thus, under the terms of the License Agreement and the Evacuation Protocol, the signatory to the agreements—either the vessel's owner or the vessel owner's agent—is liable to CBM for damage to the Marina caused by the vessels.  In this case, Kral, Jr. signed the documents both in his capacity as a principal of Subbase and in his capacity as an agent for the vessels' owner, PRMTA.  Therefore, Subbase is liable for any damage to the Marina caused by the PRMTA vessels.  The next issue is whether Subbase breached the terms of these contracts.

On August 17, 2018, CBM sought payment from Subbase for damages to the Marina caused by the Caribeña and the Culebra II.[38]  As discussed more fully below, the Court finds that both vessels damaged the Marina.  Subbase refused to pay CBM.  Therefore, Subbase breached the terms of both the License Agreement and the Evacuation Protocol.

### III.    CAUSATION AND DAMAGES

"[A] federal court sitting in admiralty is not tied to any strict rules of the common law, but has the authority to make equitable decisions, considering all of the facts and circumstances of the individual case."  *BP Expl. & Oil, Inc. v. Moran Mid-Atl. Corp.*, 147 F. Supp. 2d 333, 341 (D.N.J. 2001) (collecting cases).  In other words, the Court may exercise its discretion in making an award that is fair given the evidence before it.  *See Standard Oil Co. v. S. Pac. Co.*, 268 U.S. 146, 156 (1925) ("It is not a matter of formulas, but there must be a reasonable judgment having its basis in

---

[38]  Oct. 28, 2020 Trial Tr. [ECF 217-3] at 64 (Ohno).

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 27

a proper consideration of all relevant facts.") (quoted in *BP Expl. & Oil, Inc.*, 147 F. Supp. 2d at 341).

A.    **Causation**

To establish liability under a contract theory, the plaintiff must prove causation.  The Court finds that the evidence presented demonstrates the following as to the Caribeña.  First, when the Caribeña broke free from its mooring, it knocked over three dolphin piles.  *Compare* Trial Ex. 25 *with* Trial Ex. 310.  Next, when the Caribeña struck the C-Dock, it knocked down the C9/C11 and C13/C15 finger piers and several pilings in that area.  *Compare* Trial Ex. 13 *with* Trial Exs. 37, 58; July 30, 2019 Dep. Tr. [ECF 137-1] at 91 (Kral, Sr.).  It also damaged the C-Dock itself.

CBM contends the Caribeña caused damage to the sidewalk behind the B-Dock bulkhead, the B2/B3 finger pier, the dolphin piles in front of the B-Dock slips, "pilings on the west side of C-Dock," the skirting on the bulkhead side of the C7 slip,[39] the C9/C11 and C13/C15 finger piers, the C-Dock itself, and the finger pier at C18/C20.   CBM relied primarily on structural and forensic engineer Paul Ferreras to prove causation.

With respect to the Caribeña, Ferreras explained that he looked at where the vessel was located at the start and at the end of the hurricane, and "tried to provide the most reasonable explanation that [] fits the damage that was observed."  Oct. 22, 2020 Trial Tr. [ECF 217] at 49 (Ferreras).  In so doing, Ferreras opined that "you're going to draw almost a straight line between where the vessel started and where the vessel ended," concluding that the Caribeña knocked over the dolphin piles in front of the B-Dock slips, and the B2/B3 finger pier.  *Id.* at 50, 68 (Ferreras).

---

[39]   CBM offered some evidence as to the condition of the skirting both before and after the passage of Hurricane Irma.  *See* Trial Exs. 60, 354.  What CBM did not offer, however, was any evidence regarding what caused that damage.

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 28

Yet on cross-examination, Ferreras conceded that he did not "know if the vessel is going straight or if it's going in an angle." *Id.* at 140 (Ferreras).[40]

As to the sidewalk behind the B-Dock bulkhead, the Court finds that CBM failed to prove that the Caribeña caused the damage in that area. Ferreras opined that the "vessels" in the B-Dock slips, including the Caribeña, struck the bulkhead and damaged the concrete on the sidewalk. Oct. 22, 2020 Trial Tr. [ECF 217] at 51 (Ferreras). However, there was no evidence offered that showed precisely how that area looked prior to the storm, and the stern of the Caribeña did not show the type of impact damage that would be expected if the vessel struck the bulkhead with the force described. *See, e.g.*, Trial Ex. 49 (Video); Oct. 22, 2020 Trial Tr. [ECF 217] at 160 (Ferreras).[41]

With respect to the B2/B3 finger pier, Ferreras stated the Caribeña "[s]lammed up against it or tugged it or pulled it." Oct. 22, 2020 Trial Tr. [ECF 217] at 141 (Ferreras). He acknowledged: "[W]e're trying to put together a puzzle and I'm not going to give you an exact foot by foot path of how it traveled. Only the *best guess* scenario that makes the best fit of the facts that we have." *Id.* at 142 (Ferreras) (emphasis added). He further conceded: "I wasn't there to witness it." *Id.* at 145 (Ferreras). Moreover, Ferreras affirmed as "equally plausible," and a "legitimate hypothesis" a scenario in which the LSJ, which was also tied to the B2/B3 finger pier, caused the pier to fail and the Caribeña to break free of its moorings. *Id.* at 168-69 (Ferreras).

---

[40] Ferreras acknowledged that reconstructing how a vessel breaks away and moves about in a hurricane is not really his area of expertise. Oct. 22, 2020 Trial Tr. [ECF 217] at 154 (Ferreras). For that reason, he had his colleague Pomeroy, a licensed captain, explain about mooring lines and how vessels are tied up. *Id.* at 154-55 (Ferreras). He conceded, however, that he does not know if Pomeroy has any expertise in how vessels move in a hurricane. *Id*. at 155 (Ferreras).

[41] Knopf testified that a drawing labeled "Plan D Rev 4" showed in yellow highlighter where the sidewalk repair was done. Oct. 26, 2020 Trial Tr. [ECF 217-1] at 184-85 (Knopf); Trial Ex. 427. That drawing shows the marked area as extending from the B3 slip to the B5 slip. The Caribeña had been moored in the B1 slip.

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 29

While the Court recognized engineer Ferreras' expertise, the Court found his candor as to the limitations regarding his opinions both refreshing and enlightening.  Thus, considering Ferreras' testimony, the Court finds that CBM has not met its burden with respect to the damage to the B2/B3 finger pier.

Further, the photographic evidence casts doubt on Ferreras' theory as to how and where the Caribeña may have come into contact with the C-Dock and its appurtenances.  Ferreras suggests the vessel, after knocking down the pilings in front of the B-Dock slips, and then being hooked by the anchor on the Run Aweigh, knocked down the C9/C11 and C13/C15 finger piers with its bow, and then made a beeline for the C-Dock on the west side at the point where the C18/C20 finger pier emerges from the opposite side, thus damaging that finger pier.[42]  It is hard to conceive of that path of travel, however, given that the dolphin pile off the C9/C11 finger pier survived the storm intact.  *See* Trial Ex. 354.  Thus, the Court concludes that CBM has not met its burden with respect to the damage to the C18/C20 finger pier.

Next, regarding the Culebra II, the Court finds that that vessel caused the following damage to the Marina.  First, it ripped out a cleat located on the T1-Dock, next to a utility box located at the intersection of the T1 and T2 docks.   *Compare* Trial Ex. 59 *with* Trial Ex. 35.  Next, the force exerted by the Culebra II on the lines running from her starboard side to cleats on the T2-Dock ripped out one of those cleats and caused two other cleats to rotate from their original position parallel to the dock to being almost perpendicular to the dock.  Trial Ex. 36.  Finally, when the Culebra II rotated around its bow and either it or the Vindicator hit the T1-Dock, damage occurred

---

[42]    In contrast, Ocello, who was at the Marina during the hurricane, testified that "when that thing [the Caribeña] broke out of the C dock–or B dock, rather –it went sideways and just kind of took out the finger piers that were there."  Jan. 8, 2020 Dep. Tr. [ECF 209-1] at 93-94 (Ocello).

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 30

to the whalers, a utility box (including a water leak in that area), and a cleat on that dock.  Trial

Ex. 36; Trial Ex. 51 (Video); Trial Ex. 52 (Video); July 30, 2019 Dep. Tr. [ECF 137-1] at 64-65

(Kral, Sr.).

**B.      <u>Damages</u>**

          "Contract damages are awarded to give the injured party the benefit of the bargain."  *Dann*

*Marine Towing, LC*, 2017 WL 3916992, at *17 (quotation marks omitted); *see also Todd*

*Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 414 (5th Cir. 1982), *cert. denied*, 459 U.S.

1036 (1982).  "The underlying rationale in breach-of-contract actions is to place the vessel owner,

as innocent party, in the position that it would have been in had the contract been fully performed."

*Dann Marine Towing, LC*, 2017 WL 3916992, at *17.  Plaintiff, the injured party, bears the initial

burden of proving those damages.  *Id.*  "It is the plaintiff's burden to prove the amount of damages

to a 'reasonable certainty' and that the damage was the result of defendant's fault."  *Id*. (citation

omitted).

          In the context of breach of a maritime contract, such damages may include reimbursement

for the reasonable cost of repairs.  *MP Leasing Corp. v. Colonna's Shipyard*, 2009 WL 2581575,

at *8 (E.D. Va. May 8, 2009).  When assessing the reasonableness of such costs, the Court may

consider both the actual cost of repairs that have been made and the "estimated cost of repairs *at*

*a time immediately following the accident*."  *Yarmouth Sea Prods. Ltd. v. Scully*, 131 F.3d 389,

399 (4th Cir 1997) (quoted in *Dann Marine Towing, LC*, 2017 WL 3916992, at *19) (quotation

marks omitted) (emphasis added).  The Court may also consider whether the repairs were made

solely to put the injured party in the position he once was or whether they were made for the

betterment of the injured party.  *Dann Marine Towing, LC*, 2017 WL 3916992, at *20.  Once

plaintiff has met its initial burden, defendant has the burden of demonstrating that plaintiff failed

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 31

to mitigate its losses.  *Id.* at *19.  If proven, that amount is deducted from the injured party's

damages.  *Id.*  Finally, the Court must determine an appropriate award for pre-judgment interest,[43]

and—if expressly provided for in the contract—an award of attorney's fees.  *Id.* at *25-26.

The Court observes that CBM offered two sources of evidence with respect to damages.

First, it elicited the testimony of Paul Ferreras as to an "engineer's estimate" he provided to CBM

to repair the areas of the Marina at which he found damage during his assessment.  Oct. 22, 2020

Trial Tr. [ECF 217] at 72-86 (Ferreras).  Ferreras worked with Fran Woods, a general contractor,

to develop those numbers.  *Id*. at 17-19, 79, 218-19 (Ferreras).  The Ferreras team arrived at a total

of $1,227,318 for the repairs to the entire Marina.  *Id*. at 76-78 (Ferreras).  Included in this figure

is a construction manager's fee of $33,000, a contingency fee of 20% of the total or $189,000, and

a construction supervision fee of $60,000.  *Id.* at 77-78 (Ferreras).  Ferreras testified that the

additional fees were not broken down by individual Subbase vessels.  *Id*. at 76 (Ferreras).

Next, CBM offered Mark Knopf to testify regarding the cost of temporary repairs and

regarding his estimates for permanent repairs to the Marina as a whole.  Knopf's amount for

temporary repairs "in various places around the marina," was $408,148.  Oct. 26, 2020 Trial Tr.

[ECF 217-1] at 127-30 (Knopf); Trial Ex. 81.[44]  In a February 12, 2018 one-page document, Knopf

---

[43]  "The rule in admiralty is that prejudgment interest should be awarded unless there are exceptional circumstances that would make such an award inequitable."  *Bankers Trust Co., v. Bethlehem Steel*, 658 F.2d 103, 108 (3d Cir. 1981).  Exceptional circumstances exist when "the party requesting interest has (1) unreasonably delayed in prosecuting the claim, (2) made a bad faith estimate of its damages that precluded settlement, or (3) not sustained any actual damages."  *Id.*  The purpose of an award of prejudgment interest is to compensate the claimant for the loss of the use of those funds; it is intended to be compensatory in nature, not punitive. *Id.*; *see also Deisler v. McCormack Aggregates, Co.*, 54 F.3d 1074, 1087 (3d Cir. 1995) ("Unlike attorney's fees and litigation expenses (which were not regarded as part of the merits of judgment at common law) prejudgment interest has traditionally been considered part of the compensation due to a plaintiff.  The Supreme Court has repeatedly held that prejudgment interest is merely an element of a plaintiff's complete compensation.") (citation omitted)).  "As to the calculation and award of prejudgment interest in admiralty, such is a matter left to the sound discretion of the district court."  *M & O Marine, Inc. v. Marquette Co.*, 730 F.2d 133, 136 (3d Cir. 1984).

[44]  Knopf contracted with CBM to perform those repairs.  Trial Ex. 81.  That contract included two change

provided an estimate of costs for the permanent repair of the entire Marina.  Trial Ex. 80.  In that estimate, Knopf gave a range of costs between $1,800,000 and 2,500,000.  *Id.*[45]

The Court will address each of the areas where damage was shown, by a preponderance of the evidence, to have been caused by one of the Subbase vessels, to determine an appropriate award.  Unfortunately, however, the evidence presented at trial made it extremely difficult for the Court to associate specific costs with specific repairs.  The invoices and estimates CBM presented lumped areas of the Marina together into a single price, and even though the Court carefully scoured the record for clarification, specific costs were rarely traceable to discreet areas of work.

### 1.    Three Dolphin Piles in Front of B-Dock Slips

According to Knopf, he installed three-pile dolphins at the B-Dock, off the ends of the B2/B3, B3/B4 and B4/B5 finger piers.  Oct. 26, 2020 Trial Tr. [ECF 217-1] at 141 (Knopf).  This work is reflected on an invoice for which CBM was billed $107,138.85.  Trial Ex. 83.   However, when asked what the invoice price included, he stated:  "Concrete finger piers and piling removals, fendering replaced on the face of C Dock, which would be in the corner of C Dock.  And then we did three pile dolphins on B Dock and pilings on the west side of C Dock."  Oct. 26, 2020 Trial Tr. [ECF 217-1] at 139 (Knopf).  From this evidence, the Court cannot determine the discrete cost of the installation of the B-Dock dolphin piles.

Ferreras also addressed costs associated with the B-Dock area, but he, too, did not break out the cost for the dolphin piles.  Oct. 22, 2020 Trial Tr. [ECF 217] at 83-84 (Ferreras).[46]  Without

---

orders, adding an additional $108,654.  Trial Exs. 82, 85.

[45]  In June of 2020, Knopf amended his previous estimate at Ohno's request, to break out costs and connect them with various locations in the Marina.  Oct. 26, 2020 Trial Tr. [ECF 217-1] at 162-63 (Knopf).  In this latter estimate, Knopf concluded the cost of permanent repairs to the entire marina would be "$2,161,000 and change."  *Id.* at 175 (Knopf).

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 33

more specific information, the Court has no basis to determine an award for this damage.[47]

## 2.    Damages Associated with the West Side of the C-Dock

The Court has found that Subbase cause damage to some of the dolphin pilings on the west side of the C-Dock,[48] to the C9/C11 and C13/C15 finger piers, and to the C-Dock itself.  This work required demolition and removal of broken and sunken concrete and pilings, as well as replacement of the damaged elements.   While CBM elicited testimony from Knopf regarding this work and presented exhibits that included at least some of the costs for these tasks, once again, the Court was unable to separate the costs incurred by specific task.   For example, in his January 22, 2018 invoice, Knopf billed a lump sum of $122,444.40 for removing concrete material at the C and B docks, removing the end of the A-Dock, replacing fendering on the T, B and D docks, installing cleats on the T-Dock, and starting demolition on the C-Dock.  Trial Ex. 82 at 2.  In addition, during his testimony, Knopf stated that approximately 60% of the amount charged was for the removal of concrete from the water at the B and C docks.  Oct. 26, 2020 Trial Tr. [ECF 217-1] at 136 (Knopf).  Knopf was not asked to further break down those costs into the areas of the B-Dock as opposed to the C-Dock.  Therefore, because the Court has not found that Subbase damaged the finger pier at the B-Dock, it has no basis from Knopf's testimony upon which to decide how much compensation CBM should receive for the C-Dock repairs alone.

---

[46]  Ferreras testified that the cost to "replace the wood piles" was $45,000, but the context of the discussion makes clear that he was referring to a portion of the cost to rebuild the B2/B3 finger pier, and not to replace the dolphin piles.  Oct. 22, 2020 Trial Tr. [ECF 217] at 83-84 (Ferreras).

[47]  In its proposed findings of fact and conclusions of law, CBM also made little effort to itemize costs or to associate costs to individual areas of the Marina it claims Subbase damaged.  [ECF 219] at 66-67.

[48]  *But see supra* Findings of Fact numbers 39 and 40.

Finally, Knopf testified that he estimated in 2018 that the cost to perform storm-related permanent repairs on the entire Marina totaled $1,800,000 to 2,500,000.   Trial Ex. 80; Oct. 26, 2020 Trial Tr. [ECF 217-1] at 151-52 (Knopf).   However, this estimate—which consisted of one page—provided only general descriptions of the work and included work in areas unaffected by either the Culebra II or the Caribeña.   In 2020, at Ohno's request, Knopf revised his permanent repair estimates to "try to itemize it, separate it into various areas that he specified."  Oct. 26, 2020 Trial Tr. [ECF 217-1] at 159-62 (Knopf).   In that effort, Knopf estimated that permanent repairs on the west side of the C-Dock would cost $1,006,227, less $5,000 for the fendering at the C7 bulkhead, which had already been completed.  *Id.* at 168 (Knopf).   On cross-examination, however, Knopf acknowledged that the permanent repairs estimate included repairing broken piling caps on piers not damaged in Hurricane Irma, and that he does not know if the damage he was addressing predated that storm.  *Id*. at 192-96 (Knopf).

CBM also offered Ferreras' engineer's estimate with respect to damages associated with the west side of the C-dock.[49]  Based upon his 2018 assessment, Ferreras testified that the costs of demolition, repair of the bulkhead, replacement of whalers, repair of the C-Dock connections, replacement of pilings and pile caps, replacement of damaged decking and replacement of pilings at certain slips totaled $209,000.   Oct. 22, 2020 Trial Tr. [ECF 217] at 84 (Ferreras).   To that amount, Ferreras would add 10% overhead, 10% profit and 5% gross receipts charges.  *Id*. at 86 (Ferreras).   Finally, he would also add a 20% contingency fee, along with a pro-rata share of the

---

[49]  Ferreras testified that the total amount of damage he would attribute to the Caribeña is $375, 959.   Oct. 22, 2020 Trial Tr. [ECF 217] at 75 (Ferreras).   This estimate includes repairs in areas of the B-Dock and the C-Dock. *Id.* at 83-84 (Ferreras).

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 35

construction management and supervision fees.  Thus,[50] the total award for damage to the C-Dock

is $318,860.[51]

### 3.      Damages Associated with the T1-Dock and the T2-Dock

Knopf testified that the cost to demolish and trace the water leak on the T1-Dock was

$2,802.  Oct. 26, 2020 Trial Tr. [ECF 217-1] at 133 (Knopf).  This figure is shown as the first item

in Change Order 1.  Trial Ex. 82 at 1.  He further testified that he replaced cleats on the "T dock"

for five percent of the $122,444.40 figure shown on a January 22, 2018 invoice, which the Court

calculates to be $6,122.  Oct. 26, 2020 Trial Tr. [ECF 217-1] at 135-37 (Knopf); Trial Ex. 82 at 2.

Knopf also testified, however, that "probably half of" the 12 cleats he replaced on the T1 and T2

docks were replaced because of damage done in Hurricane Irma.  Oct. 26, 2020 Trial Tr. [ECF

217-1] at 190-91 (Knopf).  This would reduce the amount associated with cleat damage caused by

Subbase to $3,061.  Knopf also offered some pricing with respect to the fendering on the T docks,

but those amounts included work in areas other than the T docks or on other items, and there was

no information provided from which the amounts could be separated out.  *See, e.g.*, Oct. 26, 2020

Trial Tr. [ECF 217-1] at 135-37 (Knopf) (testifying that the fendering at the T and B docks was

---

[50]  Subbase did not present any evidence demonstrating that CBM failed to mitigate its losses as to the west side of the C-Dock.

[51]  The Court calculated this amount as follows.  $209,000 is 17% of the total marine repair estimate of $1,227,318.  $5,610 is 17% of the $33,000 construction management fee and $10,200 is 17% of the $60,000 construction supervision fee.  $209,000 + $5,610 + $10,200 + $20,900 (10% overhead) + $20,900 (10% profit) + $10,450 (5% gross receipts tax) + $41,800 (20% contingency) = $318,860.

In addition, the Court notes that during cross-examination, Ferreras conceded that his estimate may have included the replacement of two single dolphin pilings that had not present prior to the hurricane.  *See* Oct. 22, 2020 Trial Tr. [ECF 217] at 136-39 (Ferreras).  However, because the Court has no way to determine the cost of replacing these two extra pilings, in the exercise of its discretion, the Court will not diminish its damage award as to the west side of the C-Dock.

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 36

15% of the $122,444 billed); *id.* at 163-64 (Knopf) (testifying that replacing fendering and cleats "was in the neighborhood of 27,000 and change, nearly 28,000").

Ferreras, on the other hand, broke out the amounts associated with repairs to the T docks necessitated by the Culebra II in a more specific manner.  He itemized the work as replacement of five sections of 3' x 12' whalers, two utility pedestals, four cleats and a fire extinguisher.  Oct. 22, 2020 Trial Tr. [ECF 217] at 83 (Ferreras).  He quantified the costs at $9,282, and stated that the amount included 10% overhead, 10% profit and 5% gross receipts charges.  *Id*. at 85 (Ferreras). The amount does not include, however, the additional construction management and supervision fees that he would apply to the cost to repair the entire Marina, which he was not able to break down by vessel.  *Id*. at 76-78 (Ferreras).  Ferreras' overall repair amount was $1,227,318, his total construction management fee was $33,000 and his construction supervision fee was $60,000.  *Id.* at 77-78 (Ferreras).  The cost of repairing the T docks is 0.8% of the total.  The pro rata share of the construction management fee is $264, and the pro rata share of the construction supervision fee is $450.  Thus, the total award related to the T docks damage, as proffered by Ferreras, would be $9,996.  To that amount, the Court would add $2,802 for the demolition and identification of the water leak on the T1-Dock, for a total of $12,798.[52]

Next, the Court must consider an award of prejudgment interest.  As an initial matter, the Court discerns no "exceptional circumstances that would make such an award inequitable." *Bankers Trust Co., v. Bethlehem Steel*, 658 F.2d 103, 108 (3d Cir. 1981).  The parties did not, however, provide the Court with any guidance as to an appropriate rate to be applied or as to an appropriate start date for the accrual of interest.  Determination of the rate to be applied rests in

---

[52] Subbase did not present any evidence demonstrating that CBM failed to mitigate its losses as to the T1 and T2 docks.

*Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.,*
Civil No. 2018-68
Page 37

the Court's discretion, applying the federal common law to compensate for the loss of use of money. *BP Expl. & Oil, Inc.*, 147 F. Supp. 2d at 347 (citing *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 194-96 (1995)). Because the Court is not bound by the rates of interest provided under local law, the Court deems that the prevailing commercial interest rates for the period would provide a more equitable measure for prejudgment interest. As the Court found in *BP Expl. & Oil, Inc.*, CBM is entitled to prejudgment interest on its damages at the monthly average bank prime rate as set forth by the Federal Reserve from time to time, from August 17, 2018, the date of its demand for payment, to the date of the judgment, compounded annually.

Finally, CBM is entitled to be reimbursed for its reasonable attorneys' fees and costs, as provided for in Paragraph 21 of the License Agreement. Such fees would be determined upon a properly submitted and supported fee application and an appropriate bill of costs.

A Judgment and Order will follow.[53]

**Dated**: April 1, 2021                              S\_____
                                                       **RUTH MILLER**
                                                       United States Magistrate Judge

---

[53] The Court did not acquire jurisdiction over the M/V Caribeña and the claims against it will be dismissed.